# In the United States Court of Federal Claims

## BID PROTEST

<table>
<tr><td>

EASTERN SHIPBUILDING GROUP, INC.,

    Plaintiff,

v.

THE UNITED STATES OF AMERICA,

    Defendant,

  and

AUSTAL USA, LLC,

    Defendant-Intervenor.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

No. 22-1571C
(Filed Under Seal: November 6, 2023 |
Reissued: December 14, 2023)

</td></tr>
</table>

Jonathan D. Shaffer, Haynes and Boone, LLP, Tysons, Virginia, for Plaintiff. Daniel H. Ramish, Haynes and Boone, LLP, and Michael J. Maroulis, Haynes and Boone, LLP, Of Counsel.

Eric E. Laufgraben, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were Bryan M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Douglas K. Mickle, Assistant Director, for Defendant. Julia A. Lobosco, Attorney, U.S. Coast Guard, Washington, DC, Of Counsel.

Seth H. Locke, Perkins Coie LLP, Washington, DC, with whom were Alexander O. Canizares, Julia M. Fox, and Brenna D. Duncan, for Defendant-Intervenor.

## OPINION AND ORDER[*]

**KAPLAN, Chief Judge.**

  In this post-award bid protest, the plaintiff, Eastern Shipbuilding Group, Inc. ("ESG" or "Eastern"), challenges the decision of the United States Coast Guard to award Intervenor, Austal USA, LLC ("Austal"), a contract to build ships during the second phase of the Coast Guard's Offshore Patrol Cutter program ("OPC 2"). ESG, the incumbent contractor for the first phase of the program ("OPC 1"), contends that the Coast Guard made a number of errors when it evaluated the technical merits of the proposals. It also argues, among other things: 1) that the Coast Guard did not perform a proper unbalanced pricing analysis; 2) that the Coast Guard awarded Austal the contract based solely on price, contrary to the terms of the Request for Proposals ("RFP"); 3) that the Coast Guard improperly determined Austal responsible; and 4) that the Coast Guard failed to reasonably address its allegations that Austal's employment of the Coast Guard's former Chief of the Office of Cutter Forces during the construction of OPC 1

created an organizational conflict of interest that gave Austal an unfair competitive advantage in the OPC 2 procurement.

All three parties have filed motions for judgment on the administrative record. See Pl.'s Mot. for J. on Administrative R. ("MJAR"), ECF No. 46; Def.'s Cross-Mot. and Resp. to Pl.'s MJAR, ECF No. 59; Def.-Intervenor's Cross-Mot. and Resp. to Pl.'s MJAR, ECF No. 58 (hereinafter Def.-Intervenor's Cross-MJAR). Additionally, ESG filed a motion to complete or supplement the administrative record with documents it believes the contracting officer should have gathered and considered during his investigation into Austal's alleged organizational conflict of interest. See Pl.'s Mot. to Suppl. or Complete Admin. R. or for Remand, ECF No. 43 (hereinafter Pl.'s Mot. to Suppl. Admin. R).

For the reasons set forth below, the Court finds that supplementation of the record is not necessary for effective judicial review, and therefore it **DENIES** ESG's motion to complete or supplement the administrative record. It further concludes that the Coast Guard's evaluation of the proposals, best value decision, responsibility determination, and organizational conflict of interest investigation were reasonable and in accordance with law. ESG's motion for judgment on the administrative record, ECF No. 46, is therefore **DENIED**, and the cross-motions of the government and Austal, ECF Nos. 58–59, are **GRANTED**.

## BACKGROUND

### I.   OPC 1 and 2

The OPC 2 program is a multibillion-dollar effort to design and build the Coast Guard's next generation of cutters to patrol intermediate waters between the open ocean and the coast. See Administrative Record ("AR") Tab 12 at 19858.[1] The patrol cutters built in the OPC 1 and 2 programs will replace ships built between thirty and fifty years ago. See AR Tab 12 at 19858. Because of the costs, the number of ships to be constructed, and their importance to the Coast Guard's mission, the Coast Guard has characterized the OPC 2 procurement as "a critical [] asset in the support of [its] national security strategy." AR Tab 8 at 3634.

ESG is a shipbuilder headquartered in Panama City, Florida. See Compl. ¶ 11, ECF No. 1. In 2016, the Coast Guard awarded ESG the OPC 1 contract, and ESG has since been building

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. In response, each of the parties filed a memorandum with proposed redactions and explanations for why—in light of "the presumption of public access to judicial records," Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998); Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993))—each proposed redaction is necessary. The Court ruled on the parties' proposed redactions by order on December 14, 2023. See Order, ECF No. 84. Consistent with the Court's order, this reissued Opinion includes the requested redactions that the Court deems appropriate to shield information that could affect an offeror's competitiveness without obscuring for the reader the facts and rationale that underpin the Court's disposition of ESG's claims.

[1] Due to the size of the administrative record, the government provided it to the Court via CD-ROM. In this Opinion, the Court will refer to the AR by tab number and page number.

OPCs. See AR Tab 52 at 42427. The government initially contracted with ESG to build up to nine cutters. See id. However, Hurricane Michael inflicted severe damage on ESG's facilities in the fall of 2018. In response, pursuant to Public Law ("P.L.") 85-804, the Coast Guard relieved ESG of its original contract obligations, reducing the number of OPCs it was required to construct to four. See id.; see also Act of Aug. 28, 1958, Pub. L. No. 85-804, 72 Stat. 972.

## II.    The RFP

### A.    Overview

After ESG was relieved of its obligations under OPC 1, the Acting Secretary of the Department of Homeland Security directed the Coast Guard to re-compete the OPC contract with the goal of building up to eleven more vessels. Id. at 42426. On January 29, 2021, the Coast Guard issued an RFP for the construction of eleven additional OPCs. See id. at 42428. To ensure full competition, the Coast Guard shared design and technical data drawn from OPC 1 with prospective offerors. See id. at 42427–28 (noting that "[e]stablishing a new, full and open competitive environment for the OPC program was a key component of the Coast Guard's strategy to recapitalize its offshore surface capabilities").

The RFP states that the Coast Guard's intent was to award a Fixed Price Incentive contract with separately priced Firm-Fixed Price and Cost-Plus Fixed Fee contract line-item numbers ("CLINs") for up to eleven OPCs. In addition, according to the RFP, the contract would be awarded to the offeror with the "proposal that represented the best value to the Government through the application of the trade-off process and the established evaluation factors." AR Tab 8 at 3619, 3929.

Under the RFP, proposals would be evaluated on the basis of the following six factors, listed in descending order of importance: Factor 1 – Production Approach; Factor 2 – Design Approach; Factor 3 – Schedule; Factor 4 – Program Management; Factor 5 – Past Performance; and Factor 6 – Price. See AR Tab 8 at 3931–32. The RFP provided that the first five, non-price factors, "when combined, are significantly more important than Factor 6, Price." Id. The RFP also specified, however, that if competing proposals "approach equality" under the first five factors, "the relative importance of the Price factor will increase." Id.

### B.    Evaluation Criteria

The RFP provided that each proposal would be evaluated for consistency with the RFP and to identify the proposal's strengths, significant strengths, weaknesses, deficiencies, and risks. See AR Tab 12 at 19889. The Source Selection Plan defined those terms as follows:

Significant strengths: "An element of a proposal which significantly exceeds a requirement of the solicitation in a way that will be advantageous to the Government during contract performance."

Strength: "An element of the proposal, which exceeds a requirement of the solicitation in a way that will be advantageous to the Government during contract performance."

Weakness: "A flaw in the proposal that increases the risk of unsuccessful contract performance."

Significant weakness: "A flaw that appreciably increases the risk of unsuccessful contract performance."

Deficiency: "A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."

Id.

### 1.      Technical Factors

The Coast Guard would assign one of five adjectival ratings ranging from Superior to Unsatisfactory for each of the four technical factors. See id. at 19890. Those adjectival ratings were defined as follows:

| Color Code | Adjectival Rating | Definition |
|---|---|---|
| **Blue** | Superior | Proposal indicates an exceptional approach and understanding that exceeds the RFP requirements. The proposal yields significant benefits to the Government. |
| **Purple** | Good | Proposal indicates a thorough approach and understanding of the requirements that exceeds the RFP requirements. The proposal yields some benefits to the Government. |
| **Green** | Satisfactory | Proposal indicates an adequate approach and understanding of the requirements that meets all RFP requirements. No significant weaknesses or deficiencies exist. |
| **Yellow** | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements. The proposal minimally meets the RFP requirement(s) or has one or more significant weaknesses. |
| **Red** | Unsatisfactory | Proposal fails to meet the minimum RFP requirement(s). The proposal has one or more deficiencies for which correction would require major revisions or a redirection of the proposal, and thus unawardable. |

Id.

The four technical factors would also be assigned a risk rating, ranging from No risk to High risk. See id. at 19891. Evaluators were to consider risks associated with the particular approach proposed by offerors, rather than risks inherent in the RFP. See id. at 19893. The risk ratings were defined as follows:

| Risk Level | Definition |
|---|---|
| None (N) | Has no potential to cause disruption of schedule, increased cost or degradation of performance. Absence of risk presents a benefit to the Government. |
| Low (L) | Has little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |

| Moderate (M) | Can potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High (H) | Is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |

Id.

### 2.    Past Performance

To enable the Coast Guard to evaluate past performance (Factor 5), offerors were required to "provide a description of Past Performance . . . in ship design and production of no more than five (5) contracts/subcontracts within the last seven (7) years that required the same or similar work in both type and complexity to the proposed OPC." AR Tab 8 at 3915. The Coast Guard noted that it might deem completed contracts and deliveries more relevant than open contracts without completed deliveries, and that "[t]he Government will make the determination as to the relevance of an Offeror's past performance." Id. at 3937. In addition, the RFP provided that the Coast Guard would review the ratings assigned relevant contracts in the Contractor Performance Assessment Reporting System ("CPARS"). See id. at 3916. It also reserved the right to contact "any person or entity" for further information related to those past projects. Id.

The Coast Guard assigned confidence ratings based on each offeror's past performance examples, assessing the extent to which the examples would lead the government to expect successful performance of the OPC 2 contract. See AR Tab 12 at 19890. Those ratings were defined as follows:

| Rating | Definition |
|---|---|
| Substantial Confidence | Based on the offeror's recent and relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent and relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent and relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent and relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |

Id.

### 3.      Price

Under the RFP, Offerors were required to supply comprehensive information relating to the cost elements of their proposals, including the cost of direct labor, direct material, other direct costs, indirect costs, and facilities capital cost of money. Id. at 3922. Additionally, offerors were required to submit cost summary data for a large number of individual CLINs. Id. They were also obligated to submit supporting data, including the techniques used to determine the reasonableness of labor hours estimates, non-recurring costs, direct labor rates, material and subcontractor costs, bill of material for certain CLINs, and other information. Id. at 3923–24.

The Coast Guard stated that it would evaluate price proposals "for completeness, reasonableness, and unbalanced pricing." Id. at 3938. The completeness evaluation would focus on whether the offeror analyzed and estimated all the costs the government identified in the RFP. Id. The government's reasonableness evaluation would focus on proposed profit and would be "determined primarily by comparison with other offers submitted," along with the Independent Government Cost Estimate and historical prices paid. Id.

The Coast Guard would analyze proposals for unbalanced pricing pursuant to FAR 15-404-1(g). That provision states that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." Id.

In short, offerors had to submit prices that were not only reasonable as to total evaluated price ("TEP"), but also reasonable and supported by sufficient data as to each line item. See AR Tab 8 at 3939; see also id. at 3917. After verifying that the data and line items submitted by offerors was correct, the Coast Guard would determine a TEP for each proposal. See id. at 3939; see also AR Tab 35 at 41531–32 (detailing the Coast Guard's TEP calculation methodology).

## III.   The Source Selection Review Process

Under the Source Selection Plan for the procurement, the evaluation would proceed in four steps. See AR Tab 12 at 19867–68. At step one, the contracting officer ("CO") would check to make sure that proposals met procedural requirements and, if they did, the CO would distribute them to the Technical Evaluation Team ("TET"), the Past Performance Evaluation Team ("PPET"), and the Price Evaluation Team ("PET"). See id. at 19868. Each team would then conduct an initial, high-level review to determine if any proposals were so grossly deficient as to eliminate them from further consideration. See id. at 19868. The teams would then conduct detailed reviews of the proposals and prepare a report discussing their findings, including consolidated lists of technical ratings, strengths and weaknesses, and risks; explanations of the teams' reasoning for those ratings; and dissenting opinions, if any. See id. at 19894 (instructions for TET); 19901–03 (instructions for PET); 19904–06 (instructions for PPET). Evaluators were directed to assess each proposal on its own merits against the RFP's criteria and, except as to price, to not compare the proposals against each other. See id. at 19891.

After evaluations were completed, the teams were to report their results to the Source Selection Evaluation Board ("SSEB"), which would prepare a report of its own for the Source Selection Advisory Council ("SSAC"). See id. at 19869. If the SSAC could not recommend an award based on initial offers, the process would move to step two, involving discussions with all offerors in the competitive range regarding their initial evaluations. See id. At step three, the CO

6

would request Final Proposal Revisions ("FPRs") from each competitive offeror. See id. at 19869–70. Finally, at step four, the SSEB chairperson, on behalf of the SSAC, would prepare Source Selection Authority ("SSA") briefing materials summarizing strengths, weaknesses, risks, and technical evaluation results, as well as a recommendation for award. See id. at 19870. The SSA would then make an award decision on behalf of the Coast Guard. See id.

## IV.   The Evaluations and Award Decision

ESG and Austal submitted their initial proposals on June 11, 2021. See AR Tab 9 (Austal's initial proposal); Tab 10 (ESG's initial proposal). Thereafter, several amendments were made to the RFP, five rounds of written discussions were held with all offerors, and the Coast Guard directed offerors to submit FPRs by March 18, 2022. See AR Tab 24 at 21066.

Upon receiving the FPRs, the various evaluation teams conducted their reviews. See AR Tab 31 (SSA Decisional Brief); Tab 32 (PPET Final Report); Tab 34 (TET Consensus Report); Tab 35 (PET Consensus Report); Tab 36 (SSEB Final Report). The Coast Guard consolidated the TET, PPET, and PET evaluations and issued final adjectival and risk ratings for each technical factor, confidence ratings for past performance, and total evaluated prices summarized below:

|  | **Austal** | **ESG** |
|---|---|---|
| **Factor 1 – Production Approach** | Superior | Superior |
|  | Moderate Risk | Low Risk |
| **Factor 2 – Design Approach** | Good | Superior |
|  | Moderate Risk | Moderate Risk |
| **Factor 3 – Schedule** | Satisfactory | Satisfactory |
|  | Moderate Risk | Low Risk |
| **Factor 4 – Program Management** | Good | Good |
|  | Low Risk | Low Risk |
| **Factor 5 – Past Performance** | Satisfactory Confidence | Satisfactory Confidence |
| **Factor 6 – Price** | $3,217,298,243 | $ [* * *] |

AR Tab 38 at 41612.[2]

The SSEB then conducted a detailed comparative analysis of the proposals, noting their commonalities and differences. See AR Tab 36 at 41595–41604. Based on this analysis, the SSEB recommended an award to Austal. See id. at 41604. It explained that while ESG (as well as one other offeror) were rated "higher based on the relative order of importance for non-price factors as compared with [Austal], when the SSEB considers the significant difference in the Total Evaluated Price, the SSEB finds that [Austal] offers the best value to the Government." Id. The SSEB acknowledged ESG's higher rating in Design Approach and the lower risk of its Production Approach and Schedule, but found that "the additional benefits that would be

---

[2] Four offerors submitted FPRs and the Coast Guard evaluated each. See id. As neither of the other two offerors is involved in this protest, the Court has not included their ratings.

achieved . . . do not justify the price premium of [approximately $[* * *]].” Id. Price, the SSEB reasoned, presented a "significant discriminator between Offerors' proposals and provides more discrimination than any other element." Id.

The SSAC unanimously concurred with the SSEB's analysis. See AR Tab 31 at 41427 ("[T]he additional benefits that would be achieved with [ESG] and Offeror D do not justify the price premium"); AR Tab 37 (SSAC Memorandum to SSA). Thereafter, on June 27, 2022, the SSA, Rear Admiral Douglas M. Schofield, signed the Decision Document identifying Austal as the recipient of the OPC 2 contract. See AR Tab 38. Rear Admiral Schofield observed that all offerors "submitted excellent and highly competitive proposals" that shared "common benefits." See id. at 41617. He noted that, while Austal's proposal was the only one assigned a significant strength, it also presented some notable risks related to its new steel processing capability, closely spaced construction projects, and high degree of subject matter expertise input. He remarked that ESG's proposal, on the other hand, provided some unique benefits to the government and lower overall risk. See id. at 41617–18.

Nonetheless, Rear Admiral Schofield reasoned, "[d]espite some differences in ratings and risk assessments, the four proposals share various common features, offer many similar benefits and the risk can be mitigated through special contractor emphasis and close Government monitoring." Id. at 41619. Because "the competing proposals approach equality in the non-price factors," he stated, he "placed greater relative importance on the price factor, in accordance with RFP Section M.5." Id. Austal's proposal, Rear Admiral Schofield explained, "meets all of the Government's requirements and in numerous ways exceeds the requirements set forth . . . and offers the best value to the Government." Id. at 41620.

The Coast Guard informed ESG that it had not been selected on June 30, 2022, and gave it a post-award debrief on July 12. See AR Tab 40 (Notice of Unsuccessful Proposal); Tab 43 Ex. 2 (Post-Award Debrief).

**V.      GAO Protest and Investigation of Alleged Organizational Conflict of Interest**

On July 15, 2022, ESG filed a protest with the Government Accountability Office ("GAO"). See AR Tab 43. ESG raised essentially the same claims as it does here regarding the evaluation process. See generally id.

ESG also alleged before GAO, as it does here, that Austal possessed an unfair competitive advantage by virtue of its employment of retired Commander Philip Crigler. See id. at 42261–68. Mr. Crigler had overseen cutter forces at the Coast Guard during the period when ESG was performing on the OPC 1 contract. See AR Tab 76 at 47489. ESG argued that in awarding the contract to Austal despite what ESG argued was an insider advantage, the Coast Guard had violated its duty to avoid an Organizational Conflict of Interest ("OCI"). See id. at 47486.

After ESG filed its protest with GAO, the CO initiated an investigation of ESG's allegation of an OCI. He found the allegation unsubstantiated. See AR Tab 76.

**VI.     The Present Action**

On October 4, 2022, ESG withdrew its GAO protest before GAO issued a decision. It filed this action several weeks later, on October 21, 2022. ECF No. 1. In its complaint, ESG

contends: 1) that the Coast Guard's evaluation of Austal's proposal was arbitrary and capricious in several respects, as was its conclusion that ESG's and Austal's proposals "approached equality"; 2) that the Coast Guard failed to reasonably evaluate ESG with respect to Factors 1–3 and 5; 3) that the Coast Guard failed to conduct a proper tradeoff and best value determination; 4) that the Coast Guard improperly determined Austal responsible; 5) that the Coast Guard failed to conduct meaningful discussions with ESG; and 6) that the Coast Guard failed to reasonably assess and address Austal's unfair competitive advantage. See id.

On December 1, 2022, ESG filed a motion to complete or supplement the administrative record with documents it contends shed light on Austal's alleged OCI. ECF No. 43. Thereafter, the parties filed their cross motions for judgment on the administrative record. ECF Nos. 46, 58–59.

On April 7, 2023, ESG filed a second motion to supplement the administrative record with a copy of a grand jury indictment issued the preceding week charging three former Austal executives with wire fraud and related offenses, and a copy of a civil complaint the Securities and Exchange Commission had filed against two of those same former executives. See Pl.'s Mot. to Suppl. Admin. R. Exs. 1–2, ECF Nos. 67-1–67-2. The Court denied the motion on May 9, 2023. ECF No. 71 (Sealed Opinion), 75 (Public Opinion).

Oral argument was held on the pending cross motions for judgment on the administrative record and ESG's first motion to complete or supplement the administrative record on August 3, 2023. See ECF No. 77.

## DISCUSSION

### I.   Standard of Review

The Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Therefore, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))).

The Court's scope of review is particularly narrow when it comes to agency judgments regarding a proposal's technical merits. As the court of appeals observed in E.W. Bliss Co. v.

United States, 77 F.3d 445, 449 (Fed. Cir. 1996), protests concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." See also RX Joint Venture, LLC v. United States, 145 Fed. Cl. 207, 213 (2019) ("[E]valuations of proposals for their technical quality involve the specialized expertise of an agency's subject-matter experts."); CSC Gov't Sols., Inc. v. United States, 129 Fed. Cl. 416, 434 (2016) (explaining that great deference must be afforded to an agency where the court reviews a technical evaluation "because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government in that regard" (internal quotation marks omitted)). The Court's function is therefore limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).

## II.   ESG's Challenges to the Agency's Evaluation of Austal's Proposed Production Approach and Schedule (Factors 1 and 3)

ESG first challenges the Coast Guard's evaluation of Austal's proposal with respect to Factors 1 and 3. See generally Pl.'s MJAR at 7–29.[3] For the reasons set forth below, the Court finds that these challenges lack merit.

### A.   Production Approach (Factor 1)

#### 1.   The TET's Evaluation

The TET identified three strengths in Austal's proposal with respect to Factor 1 – Production Approach. They were: 1) the close proximity between Austal's C5I production facility and the manufacturing yard; 2) the resilience of its facilities to environmental impacts, including major storms and other severe weather events; and 3) Austal's "demonstrated current, certified dry dock facilities for launching" the OPC. See AR Tab 33 at 41481–82.

In addition, the TET found that Austal's proposal to construct the OPC almost entirely within a fully enclosed facility merited a significant strength, which was the only significant strength the TET assigned to any offeror. See id. at 41481. The TET explained that employing a fully enclosed facility would: 1) significantly reduce the likelihood of weather-related schedule delays, particularly during welding and painting production activity; 2) significantly reduce the likelihood of corrosion and weather-related damage; and 3) increase consistency and quality by protecting against varying weather conditions. See id. The combination of these strengths, the TET concluded, justified assigning Austal a Superior rating as to Factor 1. See id. at 41483.

Notwithstanding the Superior rating, the TET acknowledged that there were several risky aspects of Austal's production approach that had the potential to result in the disruption of the schedule, increased cost, and/or degradation of performance. These were: 1) that Austal was establishing a new business line in creating a large steel processing capability; 2) that Austal proposed a closely spaced ship construction program, which meant that only one OPC could be

---

[3] ESG also alleged in its complaint that the Coast Guard improperly rated Austal under Factor 4 – Program Management. See Compl. ¶¶ 64–67. However, it did not include that issue in its MJAR, and the Court therefore considers that claim abandoned.

constructed at a time and that the previous OPC would have to be launched before Austal could begin making another; and 3) that Austal's estimate that [* * *] labor hours would be needed to build eleven OPCs, was about [* * *] labor hours less than the Government Life Cycle Cost estimate. See id. at 41485.

The TET found that these aspects of Austal's proposal had the "potential to cause notable disruptions to schedule," but concluded that "special contractor emphasis and close Government monitoring will likely be able to overcome difficulties." Id. It therefore assigned the proposal a Moderate risk.

## 2.    ESG's Challenges

ESG challenges both the Superior rating assigned to Austal's production approach, and the Agency's conclusion that the proposal presented only a Moderate, as opposed to High, risk. It contends that the Superior rating the TET assigned to Austal under Factor 1 was based on an exaggerated view of the benefits of Austal's facilities. In particular, ESG argues, Austal's proposal to use a fully enclosed facility to build the OPCs did not merit the assignment of a significant strength. See Pl.'s MJAR at 8. It points to what it calls the "exceptional first-time quality" of its own work under OPC 1, in which it used both covered and non-covered facilities. See id. Moreover, ESG observes that the RFP stated that "[e]xisting shipbuilding facilities . . . may be evaluated as a benefit to the government." See AR Tab 8 at 3932. The enclosed facilities for which the TET credited Austal with a significant strength, ESG asserts, did not yet exist at the time of the proposal, but would have to be built. Therefore, ESG argues, the enclosed facilities should not have been treated as a benefit to the Coast Guard. See Pl.'s MJAR at 9–10.

These arguments are unpersuasive. The Coast Guard concluded that a fully enclosed facility would provide a significant benefit to the government by reducing the risks of delay and improving the quality of the vessels. ESG itself concedes that "welding in the rain is a safety hazard," that "panting in the rain will cause poor paint adhesion," and that "rainy weather can cause corrosion and other damage and may result in schedule delays." Id. at 8. While ESG apparently disagrees with the importance the TET assigned to the benefits of an enclosed facility, that judgment call was one that the Agency had the discretion to make, and about which the Court has little say, so long as the Agency has explained its determination (as it did here). See Navarro Rsch. & Eng'g, Inc. v. United States, 151 Fed. Cl. 184, 198 (2020) (whether the feature of a proposal merits a "strength" or a "significant strength" involves an inherently subjective judgment that the Court will not disturb).

There is also no merit to ESG's argument that the RFP did not permit the TET to credit Austal with a significant strength based on a facility that had not yet been built when the proposal was submitted. Austal explained in its proposal that the facility would be built by April 2022, before it would start work on the production of OPCs. And the very section of the RFP upon which ESG relies to show that the Agency could not consider a proposed facility that existed only on paper begins with the statement that "the Government will evaluate the Offeror's proposed facilities to support the design and production of high-quality OPCs that meet or exceed the requirements of the RFP." AR Tab 8 at 3932 (emphasis supplied).

To be sure, the subsequent paragraph upon which ESG relies states that "[e]xisting shipbuilding facilities . . . may be evaluated as a benefit to the government" where they "meet or exceed the capacity required to build the proposed OPCs." Id. But this language does not address

11

one way or the other whether credit can be assigned for facilities that have not yet been built. That circumstance is addressed in the preceding paragraph which expressly states, as noted, that the Agency will evaluate "proposed facilities."

ESG's argument that the Agency should have assigned a High risk characterization to Austal's production approach (rather than a Moderate risk) fares no better. See Pl.'s MJAR at 10–11. The Agency identified a number of the same risks to Austal's proposed production approach that ESG discusses in its motion. Those risks included that the steel processing facility was a new business line, that Austal would be building multiple ships in the same facility, and that Austal had underestimated the steel production hours needed to build the eleven additional ships. ESG's challenge to the Moderate risk determination is therefore based primarily on the notion that the risks of delay that the Coast Guard identified were more serious than it believed them to be.

For example, ESG argues that the Coast Guard underestimated the risk of delays posed by the fact that, before it began production on OPCs, Austal planned to construct steel vessels for the Navy's Towing, Salvage, and Rescue Ships ("T-ATS") program in the same assembly area. Id. at 11–12. ESG points out that while Austal stated in its proposal that it would produce three such vessels, the Navy exercised its option to order two additional vessels in July 2022. In addition, ESG notes that, starting in 2023, and continuing each year through 2027, other steel hull vessels would be built at the same facility under the Navy's Large Unmanned Surface Vehicles ("LUSV") program. Id. at 12. ESG argues that "[a]dding this simultaneous multi-vessel Navy work to the steel production line, along with the unaccounted-for Navy T-ATS vessels, compounds Austal's already severe schedule risk for constructing the OPC." Id.

But the Coast Guard could not have known or taken into consideration the two additional Navy T-ATS vessels because it awarded the OPC 2 contract to Austal on June 30, 2022, before the Navy exercised its option. More importantly, the TET acknowledged the risk of cascading delays associated with Austal's plan to construct multiple steel ships in the same bay. See AR Tab 33 at 41484 ("[T]he Offeror has proposed another closely spaced ship construction program utilizing the same assembly bay as OPC. This element is considered a risk increaser."). It simply made a different calculation regarding the seriousness of the risk the additional construction work posed than the one ESG believes would have been more appropriate. The Court has no authority to second guess the Agency's determination in that regard.

ESG also argues that the TET failed to reasonably evaluate the learning curve identified in Austal's proposal. See Pl.'s MJAR at 13. The RFP required the Agency to evaluate learning curves "to support the production of OPCs that meet or exceed the requirements of this RFP." AR Tab 8 at 3933. It further stated that "[t]he Government will evaluate the related assumptions and rationale about the shape of the curve to determine whether the learning curve and its assumptions are consistent with the Offeror's technical approach." Id.

The Agency conducted an evaluation of Austal's asserted [* * *]% learning curve as the RFP required. It found that the curve was "based on historical learning curves and supported by class actual data," as well as subject-matter expert ("SME") estimates. AR Tab 33 at 41482. It determined that the rationale and assumptions underlying Austal's learning curve were consistent with Austal's production approach and its ability to produce two OPCs per year. Id. at 41482–41483.

12

ESG contends that the Coast Guard did not evaluate "a key element of its learning curve"—Austal's proposed labor hours on its first ship ("T-1 hours"). Pl.'s MJAR at 13. A flawed T-1 starting point, it observes, "will infect the entire 11-hull estimate (i.e., if unit 1 is too low, all subsequent hulls will also be too low)." Id.

But the premise of this argument—that the Coast Guard did not evaluate Austal's proposed labor hours—is incorrect. The Agency noted that Austal used the estimates of subject matter experts to predict how many labor hours would be associated with the production of the OPCs, and it acknowledged that doing so was "a risk increaser." AR Tab 33 at 41484. It also recognized a "high degree of uncertainty associated with the labor hours . . . to which the learning curve was applied." Id. The Coast Guard noted, however, if the risks attendant to under-estimated labor hours were realized, Austal would have to address the ensuing difficulties by "dedicat[ing] additional man hours to OPC production not accounted for in their proposal." Id. at 41485. While ESG disagrees with the Coast Guard's judgment call regarding whether the problems could "likely be overcome," that disagreement does not provide a basis for disturbing the Agency's assessment of the risk attendant to this aspect of Austal's proposal.

The Court has also considered ESG's arguments that the Coast Guard did not evaluate Austal's proposal against what it calls "key sets of benchmarks"—the Agency's Life Cycle Cost Estimate ("LCCE"), Eastern's own OPC 2 proposal and another offeror's proposal. Pl.'s MJAR at 17–18. But these are not mentioned as "benchmarks" in the RFP. The Source Selection Plan required the Coast Guard to "[e]valuate each proposal against the evaluation criteria stated in the solicitation" and stated that the evaluators should "ensure that proposals are not compared against one another." AR Tab 12 at 19863.

Finally, it bears noting that the distinction between Moderate and High risk proposals is based on the relative likelihood that risks that are identified will materialize and cause negative outcomes, taking into consideration the extent to which such negative outcomes can be avoided. Moderate risk proposals "can potentially" cause schedule disruptions, increased costs, or degradation of performance, whereas High risk ones are "likely" to cause "significant" disruptions, increased cost, and performance degradation. Similarly, a Moderate risk may be assigned where special contractor emphasis and close government monitoring "will likely be able to overcome any difficulties," whereas a risk is designated as "High" where such emphasis and close monitoring is "unlikely to overcome any difficulties." Determining the seriousness of identified risks and whether they can be avoided, in short, requires the application of largely subjective predictive judgments. Those are precisely the sorts of judgments that are left to the discretion of procurement officials.

### B.    Schedule (Factor 3)

Factor 3, Schedule, concerned the offeror's "approach to scheduling and resource allocation to design and OPC production." AR Tab 8 at 3935. The RFP provided that under this factor, the Coast Guard would "review the Offeror's optimal schedule, major events, and activity dependencies to assess if the Offeror's approach is complete, comprehensive, logically sequenced, and achievable in . . . [p]lanning and meeting Detail Design and Production milestones," and "[a]chieving and sustaining production of multiple OPCs at one time and delivering two OPCs per year." Id.

The Agency assigned Austal a Satisfactory rating under Factor 3. It found that the proposal reflected an "adequate approach and understanding of the requirements that meets the RFP requirements" and that the Schedule "contained no significant weaknesses or deficiencies, but offered no notable benefits to the Government." AR Tab 33 at 41494. It found that the proposal posed a Moderate risk under Factor 3 based on changes Austal had proposed to the structural design of the OPC. Id. at 41495. Those proposed changes would require additional review and design work that were not included in Austal's schedule. Id.

As noted above, in its Factor 1 evaluation, the TET determined that there was a risk of cascading delays arising out of Austal's plan to construct multiple steel vessels in the same bay. ESG argues that the Agency should have also considered that possibility a risk for purposes of its Factor 3 assessment. See Pl.'s MJAR at 18. ESG relies upon provisions in the RFP stating that "[e]ach factor will be evaluated on a stand-alone basis" and that "[e]ach technical factor will receive a separate risk rating." AR Tab 8 at 3930. But there is nothing in the RFP that required the Agency to count the same risk against an offeror multiple times under separate factors. And the cited language does not prevent the Agency from determining that a particular risk it identifies is more pertinent to one factor than to another.

Here, for example, the Agency chose to consider Austal's proposed design changes a risk under Factor 3 because Austal did not include time to perform the required reviews and design work in the schedule it proposed. It treated the risk of delays caused by Austal's plan to construct multiple steel vessels in the same bay as a production risk, rather than a schedule risk, because it involved the methods and means of producing the OPCs. These risk allocations were reasonable ones. The Court therefore finds without merit ESG's argument that risks identified under Factor 1 should also have been assigned under Factor 3.

## III.    ESG's Challenge to Evaluation of Austal's Past Performance (Factor 5)

ESG contends that the Coast Guard's evaluation of Austal's past performance was arbitrary and capricious and contrary to law. It argues that the Coast Guard "failed to consider devastating information about Austal's prior shipbuilding performance that was too close at hand to ignore," that it "failed to follow the terms of the RFP by considering out-of-period past performance," and that it "neglected to adequately address material adverse past performance in its evaluation of Austal." Pl.'s MJAR at 19–20.

Agencies have "broad discretion" in assessing the rating assigned to an offeror's past performance as part of the procurement process, and their determinations may not be set aside unless they "lack a rational basis." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 910 (Fed. Cir. 2013). None of ESG's arguments persuade the Court that the PPET's evaluation of Austal's past performance was irrational or inconsistent with the terms of the RFP.

### A.    Failure to Consider Reports Regarding Problems With Vessels Austal had Built for the Navy

ESG contends that when it assigned Austal a Satisfactory Confidence rating for the past performance factor, the Agency ignored "widely publicized news reports" circulating in the months before the contract award, which described serious defects in the Littoral Combat Ships that Austal had built for the Navy under its FY2011 contract. See Pl.'s MJAR at 20. ESG claims that two of the ships Austal built had "such severe structural defects that the Navy

decommissioned them." See id. (citing Compl. ¶¶ 159–160) (emphasis omitted). It asserts that information about the defects was "too close at hand" to be ignored and that the Coast Guard knew about the problems as evidenced by the fact that "[t]here were hotly-debated proposals that the Coast Guard acquire decommissioned LCS's from the Navy." Pl.'s MJAR at 20 (quoting Insight Pub. Sector, Inc. v. United States, 157 Fed. Cl. 398, 410 (2021)). Indeed, ESG asserts, during the GAO protest the CO had acknowledged that the Coast Guard was aware of the issues involving the Littoral Combat Ships that were described in the news reports. Pl.'s MJAR at 21 (citing AR Tab 52 at 42458).

ESG's arguments that the Coast Guard "ignored" or "turned a blind eye" to issues related to the LCS FY2011 contract are belied by the record. The PPET did not ignore performance issues; rather, it viewed those that arose in the context of Austal's performance over time, which reflected significant improvements.

The PPET reviewed seven CPARS assessments of Austal's performance under the LCS FY2011 contract for ending periods ranging from September 2014 to September 2020. See AR Tab 32 at 41439. The PPET noted that Austal received Marginal CPARS ratings in its first four assessment periods concerning schedule, as well as a Marginal rating for quality in its first period because of a welding defect, and a Marginal rating for cost control in the first three periods. See id. at 41439–40. It observed, however, that Austal's ratings continuously improved in each assessment period, and that Austal eventually obtained Satisfactory ratings across the board. See id. The PPET also noted that similar issues had arisen during the early periods of Austal's LCS FY2017 contract but found that Austal's performance continually improved on that contract as well, earning Satisfactory ratings for quality and Very Good ratings for schedule and cost control in its most recent periods. See id. at 41440–41.

It was within the Agency's discretion for it to give greater weight to Austal's more recent performance record than to the problems it experienced earlier on. The PPET extensively examined Austal's performance examples and considered each contract thoroughly. See id. at 41436–45. It concluded, based on the entirety of Austal's performance record, that it had "a reasonable expectation of successful performance because of the complexity of the work, the mostly SATISFACTORY CPARS ratings, the positive performance trends shown in the performance of the two LCS contracts as well as the performance under the EPF and the performance of [Austal's] System Integrator." Id. at 41437; see also id. at 41445.

Given the thorough examination of Austal's past performance record reflected in the PPET report, as well as the broad discretion courts afford to the assessments of procurement officials, the Court has no basis for disturbing their assignment of a Satisfactory Confidence rating based on Austal's past performance. See Mortg. Contracting Servs., LLC v. United States, 153 Fed. Cl. 89, 125 (2021) ("[I]n the bid protest context, the assignment of a past performance rating is reviewed only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.").

## B. Consideration of Performance More than Seven Years Before the Submission of Austal's FPR

The RFP stated that the Agency would consider "past performance on contracts performed or currently being performed over the last seven (7) years that required the same or

similar work in both type and complexity as the work required by this solicitation." AR Tab 8 at 3937. According to ESG, because it submitted its FPR on March 18, 2022, the Agency could only consider past performance examples involving work Austal performed on or after March 18, 2015. See Pl.'s MJAR at 21. The CPARS the PPET considered, however, went as far back as the performance period ending in September 2014 for both the LCS FY 2011 contract and the Expeditionary Fast Transport ("EFT") FY2008 contract. See AR Tab 53c-1 at 43819.

ESG's argument is flawed because it employs the date that the FPRs were submitted (March 18, 2015) as the date from which the seven years are counted. But the PPET instead started the seven-year lookback on June 11, 2021—the date of the receipt of initial proposals. AR Tab 32 at 41433 (PPET statement that it would consider performance "within the last seven (7) years from the proposal receipt date of 11 June 2021."). Therefore, the earliest date for relevant performance was June 11, 2014.

The PPET, as noted, considered CPARS with ending periods ranging from September 2014 to September 2020. The ending period for the oldest CPARS before the Agency (September 2014) included performance that occurred after June 11, 2014. It was therefore appropriate for that CPARS to be taken into consideration. ESG's argument that the Agency impermissibly considered examples of performance that were too old lacks merit.[4]

### C.   Relevance of Past Performance Examples

ESG argues that the Coast Guard failed to consider whether Austal's past performance examples were sufficiently similar to the OPC 2 contract. See Pl.'s MJAR at 22. Specifically, ESG notes that Austal's prior contracts involved aluminum, rather than steel, ships and also that the projects involved catamarans or trimarans, while OPCs are monohull. See id. at 22–23. According to ESG, "[s]teel shipbuilding presents unique risks and different production processes and steps compared to aluminum, which the PPET appears not to have accounted for in any meaningful way." Id. at 23.

But the PPET in fact did in fact take into consideration that Austal's prior work involved aluminum ships, specifically noting that the LCS has an aluminum hull. See AR Tab 32 at 41438. Nonetheless, the PPET concluded that there were many similarities between the designs of the LCS and the OPC. Further, it observed that the LCS ship design was more complex than the OPC design, which reasonably increased the Agency's confidence in Austal's ability to

---

[4] Under the RFP, the Agency stated that it would consider five contracts in assessing past performance. AR Tab 8 at 3915. In its opening brief, ESG contended that the PPET's evaluation was inconsistent with this provision because Austal submitted seven contracts for consideration. Pl.'s MJAR at 22. According to ESG, although the Agency expressly stated that it would not consider two of Austal's submitted contracts, "there was no way for the USCG to distinguish and avoid consideration of the additional contracts, conferring an unfair advantage on Austal." Id. This contention—which ESG seems to have abandoned in its Reply—is unsupported by the record. The PPET report identifies the five contracts that it considered and the two that it did not. AR Tab 32 at 41437. It also expressly affirmed that "past performance references in excess of the number allowed were not considered." Id. The Court has no reason to doubt the Agency's assertion that it considered only five of Austal's contracts. ESG's claim that the evaluation did not comport with the RFP therefore lacks merit.

deliver the latter. See id. at 41438, 41445. The Court therefore rejects ESG's contention that the Agency did not give sufficient weight to differences between the construction of the two types of vessels.

### D.   Failure to Consider Other Negative CPARS Information

Finally, ESG argues that the PPET failed to take other negative information from past performance evaluations into account. See Pl.'s MJAR at 23 (citing various Austal CPARS). This argument is not supported by the record. As noted above, the PPET specifically recognized that the CPARS assessments identified several quality, cost control, and schedule issues on Austal's LCS FY2011 contract. See AR Tab 32 at 41439. However, the PPET also noted that Austal's assessments had improved over the past several assessment periods, a trend that continued on Austal's LCS FY2017 contract. See id. at 41439–40. In all, the record reflects that the PPET thoroughly evaluated Austal's past CPARS, considering both the negatives and the positives and concluding that, although Austal had some performance issues, it was able to respond to them adequately and correct problems as they arose. See generally id. at 41438–44. Austal's arguments that the PPET did not take negative information into consideration when assessing Austal's past performance examples therefore lacks merit.

## IV.   ESG's Challenges to Evaluation of Austal's Price Proposal (Factor 6)

As noted above, under the RFP, the Agency was to evaluate price proposals for completeness, reasonableness, and unbalanced pricing. AR Tab 8 at 3922. To those ends, the PET conducted a thorough analysis of the price proposals each offeror submitted as part of its FPR. See generally AR Tab 35. It compared each proposal's TEP with the government's lifecycle cost estimate. See id. at 41533–34. It compared the offerors' initial price proposals to those contained in their FPRs to determine the reasons for the changes. The PET also compared and analyzed the price proposals on a CLIN-by-CLIN basis, id. at 41534–37, and examined the cost elements that contributed to several of the CLINs to understand the basis for their prices, as well as the basis for the variance between offerors, id. at 41538–44.

Based on its analysis, the PET concluded that each proposal was complete and that there was no unbalanced pricing of CLINs in any of the proposals. Id. at 41544–45. It also concluded—based on a comparison of each proposal with both the government's estimates and the proposals of the other offerors—that the proposed prices, including profit, were reasonable. Id. at 41545–46.

ESG challenges two aspects of the Coast Guard's evaluation of Austal's price proposal. First, ESG argues that the Coast Guard and the PET failed to conduct a proper unbalanced pricing analysis. See Pl.'s MJAR at 24. Second, ESG argues that the price volume in Austal's FPR did not comply with the requirement in RFP Amendment 6, that it contain an adequate explanation of the changes it effected. See id. at 28. Neither argument is persuasive.

### A.   Unbalanced Pricing

"Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." FAR 15.404-1(g)(1); see also AR Tab 8 at 3939 (RFP). Because unbalanced pricing "may increase performance risk and could result in payment of unreasonably high prices" contracting officers are required to conduct an unbalanced pricing analysis. FAR

15.404-1(g)(2); see also AR Tab 8 at 3938–39 (RFP requiring Agency to conduct unbalanced pricing analysis).

An agency may use "various price analysis techniques and procedures" when assessing whether pricing is unbalanced. FAR 15.404-1(b)(2)(i)-(ii), (v). These include "[c]omparison of proposed prices received in response to the solicitation" and "[c]omparison of proposed prices with independent Government cost estimates." Id.

If the Agency's price analysis indicates that a proposal's pricing is unbalanced, the CO is required to "[c]onsider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and "[c]onsider whether award of the contract will result in paying unreasonably high prices for contract performance." FAR 15.404-1(g)(2)(i)–(ii). No such consideration of risk is required, however, where the CO does not find the prices unbalanced. See IAP World Svs., Inc. v. United States, 153 Fed. Cl. 564, 571 (2021) ("[B]ecause the Navy rationally determined that there was no unbalanced pricing, there was no basis to get to the second step of the analysis and consider the risks to the Government.").

ESG contends that two of the CLINs covered by Austal's price proposal reflect unbalanced pricing. Specifically, it references the Production/Classing CLIN price in Austal's FPR, which was about [* * *]% lower (i.e., $ [* * *] less) than the government's estimated lifecycle cost and more than [* * *]% lower (or approximately $ [* * *]) than the nearest Production/Classing CLIN price of any offeror. See Pl.'s MJAR at 24 (citing AR Tab 35 at 41534). Second, it cites Austal's Long-Lead Time and Materials ("LLTM") pricing, characterizing it as "an outlier" at $[* * *], which was [* * *] times the government lifecycle cost estimate of $[* * *]. Id. (citing AR Tab 35 at 41534).

ESG's argument lacks merit. In conducting its analysis, the PPET decided to consider the production line items (including LLTM and Production/Classing) together, rather than separately. See id. at 41536. The result was a substantial reduction in the difference between Austal's combined CLIN prices and the corresponding government cost estimate (down to [* * *]% or $[* * *]). See id. at 41534.

ESG challenges the PET's decision to consider LLTM and production/classing line items together, contending that it was irrational and contrary to the terms of the RFP. See Pl.'s MJAR at 25. But the RFP did not prescribe the methodology that the PET was to use or provide that it could not combine CLINs when conducting an analysis. Moreover, the PET explained why it chose to combine those items. It observed that the RFP had not included a specific list of LLTM equipment, so that there was no consistency among the offerors as to which equipment should be included in the LLTM CLIN. See AR Tab 35 at 41536. This meant that comparisons between proposals with respect to these CLIN could not be made on an apples-to-apples basis. The PET concluded that there was "no actual value in comparing the proposed LLTM cost to the LCCE or to each of the Offerors to one another, as Offeror pricing is not commensurate to LCCE estimates or other Offerors." Id. It decided to consider the LLTM with the production CLINS to provide "a more equal comparison in terms of balanced pricing." Id. The Agency had the discretion under the RFP to choose what methodology to use to analyze unbalanced pricing, and the Court cannot say that its choice was not a rational one.

Ultimately, the PET concluded that "no Offerors proposed line items or sub-line items [that] were significantly understated or overstated to the point of introducing an unacceptable

risk to the Government." Id. at 41545. ESG takes issue with this conclusion, arguing that it overlooks, among other risks, Austal's inclusion of a "much greater proportion of its material costs" in the LLTM CLIN, which was a fixed-price CLIN, as opposed to in Production/Classing, which is a fixed-price incentive firm target. Had it included those costs in the latter, the Coast Guard would have borne 50–70% of the costs above the target cost up to the ceiling price. Pl.'s MJAR at 25. ESG argues that as a result of Austal's choice, if it were to experience overruns with LLTMs, it would have to bear the costs, increasing the risk that Austal would run out of resources to complete the project. See id. at 25–26.

As noted above, under the FAR, an agency is obligated to conduct an analysis regarding performance risks only if it concludes that pricing is unbalanced. See FAR 15.404-1(g)(2) (requiring the government to analyze risks only if it finds unbalanced pricing). ESG finds such a conclusion implicit in the PET's statement that "no Offerors proposed line items or sub-line items [that] were significantly understated or overstated to the point of introducing an unacceptable risk to the Government." AR Tab 35 at 41545. But ESG's interpretation is unpersuasive because it ignores both the bulk of the PET report and the rest of the sentence in which the relevant quote appears. After observing that "no Offerors proposed line items or sub-line items [that] were significantly understated or overstated to the point of introducing an unacceptable risk to the Government," the PET went on to say that "therefore, each Offeror is deemed to have balanced pricing based on the price discussion as described in the report above at 2.b." Id. at 41545.

The price discussion in Section 2.b, in turn, contains a detailed analysis of each CLIN, including a comparison of the CLIN prices among all of the offerors and to the government estimate. Id. at 41533–38. It also includes express findings that none of the offerors' proposed CLINS were over- or understated (i.e., that there was no unbalanced pricing). See, e.g., id. at 41537 (stating that combined LLTM and Production/Classing CLINs "are not considered to be overstated or understated for any of the Offerors").

In short, the Coast Guard was not obligated to conduct a risk analysis because the PET did not find unbalanced pricing in Austal's proposal. Its challenge to the Agency's unbalanced pricing analysis therefore fails.

### B.   Compliance With Instructions to Explain Changes in Price Volumes

As noted, ESG also contends that Austal's FPR price volume did not comply with the Coast Guard's instruction in RFP Amendment 6 that if the FPR affected changes to the price volume, those changes "must be explained, traceable, and understandable." Pl.'s MJAR at 28 (citing AR Tab 24 at 21065). Specifically, ESG contends that Austal did not adequately explain reductions in its price estimates relating to equipment, materials, materials handling hours, and profit, among other elements. Id. at 28. It notes that the cost reductions attributable to these items totaled more than $[* * *], and that the reduction in profit contained in the FPR price volume was another $[* * *]. Id.

This argument lacks merit. The RFP did not require Austal to provide detailed or explicit line by line explanations of each variance between its initial proposal and its FPR. It merely required that changes in Austal's final price volume be "explained, traceable, and understandable." AR Tab 24 at 21065. The PET was the ultimate arbiter of whether offerors provided explanations sufficient for it to understand the basis for the changes in their price

volumes. And it found that "[a]ll Offerors' [final proposal revisions] are in compliance with the instructions outlined in Amendment 006." AR Tab 35 at 41544.

Moreover, the PET's report contained a comparison of the variance between each offeror's initial and FPR price volumes on a CLIN-by-CLIN basis. Id. at 41533–38. It also included a discussion of the offerors' explanations for at least some of the variances observed. See, e.g., id. at 41536 (noting that Austal's reduction in material costs "reflected "current/updated index data" and that Austal "admittedly proposed more conservative prices during initial proposal submission and thereby lowered its proposed material costs in its FPR.").

The PET, in short, was satisfied that it could evaluate all of the proposals (including Austal's) for completeness, reasonableness and unbalanced pricing based on the information the offerors supplied in their price volumes. Id. The Agency therefore acted within its discretion when it concluded that the changes in Austal's FPR Price Volume were adequately "explained, traceable, and understandable" as required by the RFP.

## V.    ESG's Challenges to the Coast Guard's Technical Evaluation of its Proposal

In addition to its complaints about the Coast Guard's technical evaluation of Austal's proposal, discussed above, ESG also argues that the Coast Guard failed to reasonably evaluate its own proposal as to Factors 1, 2, and 3. [5] See Pl.'s MJAR at 29–39. For the reasons set forth below, the Court concludes that ESG's objections to the Agency's technical evaluation of its proposal lack merit.

### A.    Unreasonable Rating for Factor 1 – Production Approach

The Coast Guard assigned Eastern's Production Approach (Factor 1) a Superior rating and assessed that it presented a Low risk—i.e., that it had "little potential to cause disruption of schedule, increased costs or degradation of performance," and that "normal contractor effort and normal Government monitoring [would] likely be able to overcome any difficulties. AR Tab 34 at 41504. ESG complains nonetheless that the Coast Guard assigned "unwarranted risk increasers" in the evaluation of ESG's Production Approach, Pl.'s MJAR at 29, and that it unreasonably failed to give ESG credit for its 3D Model, which it characterizes as "a tool with great benefits to the production process that will significantly reduce performance risks," id. at 31.

First, ESG argues that it was unreasonable for the TET to characterize as a "net risk increaser" ESG's use of its OPC 1 Estimates to Completion as part of its basis for determining its OPC 2 labor resources and learning curve. See Pl.'s MJAR at 29–30 (citing AR Tab 34 at 41512). ESG relied in part on the estimates because, at the time ESG submitted its proposal, it had not completed its work on the OPC 1 contract. In fact, the work it completed was only 34.8 percent of the cumulative OPC 1 Estimate at Completion for the two hulls in production. See AR Tab 34 at 41512.

---

[5] In its motion for judgment on the administrative record, ESG appears to abandon its argument that the Coast Guard improperly evaluated it under Factor 5 – Past Performance. The Court therefore does not address the Coast Guard's rating of ESG under that factor on the merits.

ESG asserts that in finding its use of estimates a risk increaser, the TET failed to appreciate that its proposal also relied on actual data from the OPC 1 program as well as data from past programs. But ESG has mischaracterized the TET's conclusion. It did not conclude that ESG's use of estimates was a "net" risk increaser. To the contrary, the TET expressly recognized that ESG had used some actual hours in formulating its proposal and that doing so was a potential risk reducer. See AR Tab 34 at 41512. The TET apparently found it a wash, and it ultimately assigned ESG's proposal a "Low risk" rating.

Eastern also alleges that the evaluation was "improperly disparate" because "[o]ther offerors had to rely on projections based on other programs alone, which makes them riskier based on the TET's conclusion that any projections for ESG are risky." Pl.'s MJAR at 30. In fact, however, the Coast Guard found a "high degree of uncertainty associated with the labor hours" proposed by Austal given that it relied on estimates and assigned its proposal a Moderate Risk rating. AR Tab 34 at 41484. And in any event, ESG has not established disparate treatment, because it has not shown that the Coast Guard "downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

ESG also argues that the TET should have given it credit based on the fact that, because of its incumbency on the OPC 1 contract, it was the only offeror with a completed 3D Product Model, which it argues will present a range of benefits that will reduce risk. See Pl.'s MJAR at 31. But nothing in the RFP stated that offerors would be given credit for advantages that come with incumbency. Moreover, the Coast Guard gave ESG credit for its experience on OPC 1 in its evaluation of Schedule (Factor 3), where it acknowledged that such experience could mitigate schedule risks. AR Tab 34 at 41523. Its decision not to also mention the model specifically, and to do so in its assessment of Production Approach, concerns the "minutiae of the procurement process[,] . . . which involve[s] discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co., 77 F.3d at 449.

## B.   Unreasonable Rating Under Factor 2 – Design Approach

The TET assigned ESG's proposal a Superior rating as to Factor 2 – Design Approach. See AR Tab 34 at 41513–18. It identified five strengths under Factor 2 and concluded that ESG's "overall design proposal which focuses on increasing operations and sustainability throughout the OPC's life cycle significantly benefits the Government." Id. at 41519.

While the overall rating assigned ESG's proposal as to Factor 2 was Superior, the TET assigned a Moderate risk rating to ESG's proposal. It concluded that under the proposal there was a "potential for the Offeror to exceed the Detail Design and Build weight margins at OPC delivery" which it characterized as "a risk increaser." Id. ESG contends that in making this determination, the TET ignored pertinent information in ESG's proposal and also contradicted some of its own conclusions. Pl.'s MJAR at 31–33. ESG also contends that the TET ignored certain aspects of its proposal that the TET had characterized as strengths. These include its 3D model, its high level of design maturity by virtue of its OPC 1 work, and its existing engineering and design resources. See Pl.'s MJAR at 34–35.

ESG's challenges to these subjective technical judgments about what aspects of its proposal present risks, and to what extent, constitute quintessential "minutiae" of the procurement process into which courts conduct only the narrowest of inquiries. So long as the

Agency has explained itself and its conclusions are not irrational, courts will not intervene with respect to these sorts of matters. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); see also Impresa Construzioni, 238 F.3d at 1332–33; Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994). Those modest requirements have been met here.

The RFP instructed offerors to "present an overview of the proposed design and the engineering design elements." AR Tab 8 at 3904. It further stated that "[t]he narrative shall complement the Detail Design Elements" contained in the Detail Design Appendix and "shall highlight any changes that reduce[] weight." Id.

In its FPR, ESG proposed 115 tons of weight reductions, for which the TET assigned it a strength. AR Tab 34 at 41515. At the same time, as noted, the TET was concerned about whether ESG might exceed the Detail Design and Build weight margins at OPC delivery. Id. at 41519. ESG had proposed "115.3 LT of weight reduction opportunities which result in a proposed Detail Design and Build (DD&B) weight margin of 3.49% (118.4 LT)." Id. at 41520. The TET explained that "[t]he lower the Detail Design and Build margin, the higher the chance of it being exceeded during Detail Design and Construction." Id. at 41519–20. "With minimal details to support the proposed weight reduction opportunities," the TET stated, "it is unclear if all proposed weight savings will be achieved." Id. at 41520. And if weight reductions were not achieved, then it might be more difficult for the Coast Guard to make weight increasing modifications in the future resulting in diminished future operational capability. See id.

ESG argues that the Coast Guard's assignment of a Moderate risk based on its purported failure to provide sufficient details to support achievement of its proposed weight reductions on delivery was arbitrary and capricious. See Pl.'s MJAR at 31. It asserts that the TET did not consider a variety of the information in its proposal, including Table 2-13, which, it says, "provided significant details on the proposed weight reductions." Id. at 31 (citing AR Tab 27a at 39908–09). Finally, ESG argues that the TET also did not consider its "significant inherent design maturity advantage" or its "locked-in weight experience with 95% of the hull," and that it did not specifically address each of the changes or the associated reductions ESG had proposed. Id. at 31–32.

The fact that the TET report does not expressly mention every part of ESG's proposal that ESG believes undermines the TET's risk assessment is not a ground for finding that assessment irrational. See Preferred Sys. Sols., Inc. v. United States, 110 Fed. Cl. 48, 59 (2013) ("[I]t is a well-understood principle of administrative law that 'the failure to mention certain evidence [does not mean] that it was not considered, nor does it follow that an explanation is incomplete unless it dutifully lists all the evidence . . . examined.'" (quoting Butte Cnty., Cal. v. Hogen, 609 F. Supp. 2d 20, 30 (D.D.C. 2009))); see also E.W. Bliss Company v. United States, 33 Fed. Cl. 123, 143 (1995), aff'd, 77 F.3d 445 (1996) (where protester challenged technical evaluation because the TEP report did not discuss aspects of its proposal, the evaluation was nevertheless reasonable because "the applicable procurement regulations do not require the summary documents to include an evaluation of the respective proposals item by item").

The Court has considered the remainder of ESG's highly technical objections to the Agency's evaluation of its proposal under Factor 2, including ESG's extensive discussion of

what it characterizes as "risk reducers" the TET allegedly failed to consider. Pl.'s MJAR at 32–35. The Court is not persuaded that any of the points that ESG makes either individually or collectively establish that the TET's decision making process was arbitrary or that the conclusions it reached were irrational. ESG's arguments represent the kind of mere disagreement with agency judgment calls that are committed to the discretion of the evaluators. The Court therefore rejects ESG's arguments concerning the evaluation of its proposal under Factor 2.

**C.   Factor 3 – Schedule**

The RFP stated that under Factor 3 – Schedule, the Agency would "review the Offeror's optimal schedule, major events, and activity dependencies to assess if the Offeror's approach is complete, comprehensive, logically sequenced, and achievable in: 1) Planning and meeting Detail Design and Production milestones for OPC-B1 to OPC-B11; and 2) Achieving and sustaining production of multiple OPCs at one time and delivering two OPCs per year." AR Tab 8 at 3935.

The TET concluded that ESG's proposed optimal schedule was "complete, comprehensive, logically sequenced, and achievable." AR Tab 34 at 41521. It also agreed that ESG's proposed optimal schedule supported its design and production approach and was sufficient to meet OPC requirements. Id. The TET assigned ESG an overall Satisfactory rating under Factor 3, identifying a single weakness (discussed below) and no strengths. It observed that the proposal contained no significant weaknesses or deficiencies, but also that "it offer[ed] no notable benefits to the Government." Id. At 41522. It also concluded that ESG's proposed schedule presented a Low risk, finding that it had "little potential to cause disruption to schedule, increased cost, or degradation of performance." Id.

ESG challenges the Agency's Factor 3 evaluation on the grounds that the weakness it assigned the proposal was unreasonable and that the Agency improperly ignored or overlooked certain strengths. Like ESG's other arguments challenging the technical evaluations of its proposal (as well as Austal's), this challenge boils down to a request that the Court substitute its judgment (or more accurately ESG's) for that of the Agency's technical experts. For the reasons set forth below, the Court declines to do so.

**1.   Weakness Assigned**

Under Factor 3 – Schedule, offerors were required to provide an integrated master schedule ("IMS"). The IMS was to include: 1) all technical events and milestones; 2) sufficient engineering planned to support delivery; 3) major detail design and production efforts (including among other items engineering and testing); 4) facility readiness milestones and activities; 5) material, supply chain, and subcontract delivery dates; and 6) other major production efforts and completion dates. AR Tab 8 at 3910–11.

The TET found that ESG's IMS "d[id] not adequately demonstrate that sufficient time is allocated to execute the Offeror's structural modifications and support CDRL delivery." AR Tab 34 at 41522. The structural changes and design modifications to which the TET referred appeared for the first time in ESG's FPR. Their goal was to reduce the weight of the vessels. Id. The TET noted that ESG's description of this effort in the IMS was unchanged from its initial proposal, which did not include the structural changes. Id. From the TET's point of view, ESG's

IMS lacked sufficient detail to ensure that its milestones would still be met notwithstanding the changes introduced in its FPR. Id.

ESG claims that the assignment of this weakness was unreasonable because—contrary to the judgment of the TET—the weight reductions were not a "major" engineering effort for which further detail in the IMS was required under the RFP. In addition, it contends that even if it were a "major" effort, the Coast Guard should have re-opened discussions to give ESG the opportunity to address its concerns regarding the lack of detail. See Pl.'s MJAR at 37.

The question of whether the structural changes in the FPR were sufficiently significant ("major") is inherently subjective and ESG provides the Court with no basis for finding the TET's determination with respect to that issue irrational. ESG's contention that the Agency was required to raise the weakness during discussions is equally meritless. The scope and extent of discussions are largely matters within the CO's discretion. See FAR 15.306(d)(3) ("The scope and extent of discussions are a matter of contracting officer judgment."); see also Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 357 (2013) (same). Under FAR 15.306(d)(3), an agency is only under an obligation to discuss "significant" weaknesses with offerors. Moreover, and in any event, there is no requirement that an agency reopen discussions on issues that arise, as they do here, out of changes made in an FPR after discussions have ended. Tele-Consultants, Inc. v. United States, 142 Fed. Cl. 686, 697 (2019) ("[A]n agency is not required to reopen discussions to afford an offeror an additional opportunity to revise its proposal where a weakness or deficiency is first introduced in the firm's revised proposal." (internal citations omitted)).

## 2.    Strengths Overlooked

ESG also contends that the TET "failed to acknowledge areas where ESG exceeded the proposal requirements in terms of schedule 'achievability.'" Pl.'s MJAR at 35. It again cites a number of the advantages it enjoys as a result of its work on OPC 1, including its 3D model, its existing facilities, and its experience in production design review. ESG also references a variety of other components of its proposal, such as its inclusion of intermediate milestones and its proposed two team production solution. According to ESG, these advantages do not appear to have even been considered in the TET's evaluation of its proposal with respect to Factor 3. Id. at 36 (citing AR Tab 34 at 41520-23).

To be sure, the TET did not discuss all of the particular components of ESG's proposal that ESG believes should have been highlighted and recognized. Nonetheless, the TET was obviously aware of the benefits of ESG's existing facilities and its 3D model, as it commented favorably on them in evaluating other factors. See AR Tab 34 at 41508–09 (discussing existing facilities). That it did not discuss the other matters that ESG believes it should have reflects only that the TET did not view them as noteworthy enough to be considered "strengths"; it does not mean that they were overlooked or ignored.

Finally, ESG argues that it should have received a strength for proposing early delivery of OPCs. See Pl.'s MJAR at 39. ESG argues that the Coast Guard's finding contradicts the RFP, which recognized that "[e]arly delivery of OPCs could reduce the need to extend service lives of existing WMECs which would close the capability gap created by age and sustainability issues." Id. (quoting AR Tab 8 at 3660). The record reflects that the Agency considered ESG's proposal to deliver "some individual cutters, such as OPC B4, with deliveries earlier than the Government notional schedule," but that it concluded that "the aggregate of all deliveries does not offer a

benefit to the Government." <u>See</u> AR Tab 34 at 41522. That conclusion—which is based on the particulars of ESG's proposal—is not inconsistent with the RFP, which stated only that early delivery "could" provide benefits to the government.

The detailed discussion of the TET's Factor 3 evaluation reflects that the TET conducted a comprehensive review of ESG's proposal, highlighting the features of the proposal that it considered beneficial and identifying one as problematic. AR Tab 34 at 41520–23. While ESG believes that the Agency shortchanged the benefits of its proposal, its disagreements with the Agency's judgment do not amount to a showing that the Agency's conclusions were irrational. The Court therefore rejects ESG's objections regarding the evaluation of its proposal under Factor 3.

## VI.    ESG's Challenges to the Coast Guard's Best Value Determination

As discussed above, the Coast Guard decided to award the contract to Austal, despite the fact that ESG's proposal (as well as that of another offeror) received higher adjectival ratings overall. It found that ESG's and Austal's proposals (as well as those of two other offerors) "approach equality in the non-price factors." <u>See</u> AR Tab 38 at 41619. It reasoned that "[d]espite some differences in ratings and risk assessments, the four proposals share various common features [and] offer many similar benefits." <u>Id.</u> Moreover, it was of the view that any risks presented by Austal's proposal, "can be mitigated through special contractor emphasis and close Government monitoring." <u>Id.</u> And finally, it concluded that "the additional benefits that would be achieved [under ESG's proposal] . . . do not justify the price premium of [approximately $[* * *]]." <u>Id.</u> at 41620.

ESG argues that it was unreasonable for the Agency to find that the proposals approached equality with respect to the non-price factors. <u>See</u> Pl.'s MJAR at 40–41. ESG points out that its proposal was rated higher in Factor 2 and lower risk in Factors 1 and 3 and asserts that its proposal offered several strengths that other offerors' proposals did not possess. <u>See</u> <u>id.</u> at 41. Additionally, ESG argues that Austal's proposal presents significant risks that are not presented by ESG's proposal. <u>See</u> <u>id.</u> at 41–43. Therefore, ESG argues, "[t]he proposals were not approaching 'parity' such that the USCG could reasonably consider them equal," and the Coast Guard could not reasonably use price as the discriminating factor. <u>See</u> <u>id.</u> at 40.

ESG's arguments invite the Court to conduct its own de novo comparison of the pros and cons of each offeror's proposal. The Court, however, lacks the authority (not to mention the competence) to conduct such an evaluation and comparative review. The Court instead defers to the Agency's judgment that ESG's and Austal's proposals "approached" equality because it is supported by the record and not irrational.

To begin with, the adjectival ratings assigned to the non-price factors in both Austal's and ESG's proposals were similar. Both received Superior ratings in Factor 1 (the most important technical factor). Both also received Satisfactory ratings in Factor 3, Good ratings in Factor 4, and Satisfactory Confidence ratings in Factor 5. <u>See</u> AR Tab 38 at 41611. And under Factors 2 and 4, ESG and Austal received the same risk ratings (Moderate risk and Low risk, respectively).

To be sure, as ESG notes, the adjectival ratings were not identical. For Factor 2, ESG received a Superior rating, whereas Austal received a Good rating. <u>Id.</u> And ESG received a

slightly lower risk rating under Factors 1 and 3 (Low risk as compared to Austal's Moderate risk). Id. Nonetheless, it was hardly irrational for the Agency to conclude that the adjectival ratings, while not identical, were similar enough to "approach equality" within the meaning of the RFP, thereby triggering an increase in the importance of price under the established evaluation factors.

Of course, the relative parity of the adjectival ratings is not dispositive. "To determine whether and to what extent meaningful differences exist between proposals, agencies should consider both adjectival ratings and information on advantages and disadvantages of the proposals." Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 758 (2008) (internal quotations omitted). The Agency did just that here; it conducted a detailed comparison of the offerors' proposals and their relative merits and then decided that any advantages of ESG's proposal over Austal's did not merit the very large (nearly $[* * *]) price differential.

ESG's argument that the Agency did not conduct a reasonable comparison of the advantages and disadvantages of the offerors' technical proposals is based in large part on the points it made in its unsuccessful challenge to the Agency's technical evaluation. See Pl.'s MJAR at 39. These arguments are derivative and, in any event, unpersuasive. Determining which proposal represents the best value to the Government requires judgment calls that are best left to agency experts. Lockheed Missiles & Space Co. v. United States, 4 F.3d 955, 960 (Fed. Cir. 1993). Source selection officials thus have broad discretion in making a price/technical tradeoff, "and the extent to which one may be sacrificed for the other is governed only by the test of rationality and consistency with the established evaluation factors." Bahrain Maritime & Mercantile Int'l BSC (C) v. United States, 118 Fed. Cl. 462, 480–81 (2014) (internal citations omitted).

In this case, the Agency's determination was both rational and consistent with the established evaluation factors. The Agency documented its consideration of each proposal's unique and common features both in the TET Report and the SSA's Source Selection Decision Document. See AR Tab 38 at 41617 (SSA stating that "[i]n making my decision, I considered the following unique aspects of the Offerors' proposals"); id. at 41617–20 (discussing unique and common aspects). The SSA's decision to assign greater importance to price than to the offerors' almost equal technical factors was consistent with the RFP and was based on the SSA's review of the documentation generated at multiple levels of review.

Finally, the Agency's conclusion that any advantages of ESG's proposal over Austal's did not justify the additional $[* * *] price tag is similarly documented in the record and well within the bounds of reasonableness. See AR Tab 38 at 41620; Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) ("Even where . . . a solicitation provides that technical criteria are more important than price, an agency must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted." (citing Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008))). Because the best value determination complied with the RFP and is supported by the record, ESG's contention that it lacked a rational basis lacks merit.

## VII.   Challenges to the Coast Guard's Responsibility Determination

### A.   The CO's Determination

Under the RFP, to be eligible for an award, an offeror must be determined responsible under the standards in FAR Subpart 9.1, AR Tab 8 at 3929, which requires that offerors must, among other things, "(a) [h]ave adequate financial resources to perform the contract, or the ability to obtain them . . .; (b) [b]e able to comply with the required or proposed delivery schedule . . .; (c) [h]ave a satisfactory performance record . . .; and (d) [h]ave a satisfactory record of integrity and business ethics," FAR 9.104-1. The FAR further provides that "[i]n the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility." FAR 9.103.

The CO concluded that Austal met all of the FAR's responsibility criteria. AR Tab 39 at 41621–41622 (CO's Responsibility Determination memorandum); see also AR Tab 53g-2 (Declaration of CO submitted to GAO); Tab 65d-3 at 46662 (Supplemental Declaration of CO submitted to GAO). She found that Austal had "adequate resources to perform the contract, or the ability to obtain them." AR Tab 39 at 41621; Tab 53g-22 at 45522. Her determination was based on the audited financial statements Austal submitted with its proposal, as well as its Duns and Bradstreet ("D&B") report, which "included extensive information such as PAYDEX Score, business credit worthiness information, and other business and financial information." AR Tab 53g-2 at 45521. In addition, she "compared the D&B report to other shipbuilding industry partners as part of a benchmarking review." Id.

The CO similarly found that Austal had "a satisfactory record of integrity and business ethics." She made this finding on the basis of her searches of the Federal Awardee Performance and Integrity Information System ("FAPIIS") and the Contractor Performance and Reporting System (CPARS). CPARS showed that Austal had maintained a satisfactory performance record over the last seven years. Id. Her search uncovered only one negative item: a $9,000 fine that the Occupational Safety and Health Administration had imposed on Austal on June 1, 2017. Id. Because the matter was relatively minor and had been resolved more than five years earlier, the CO found that Austal had a satisfactory record of integrity and business ethics. Id.

### B.   Standard of Review

As the court of appeals has observed, contracting officers are afforded wide discretion in making responsibility determinations. Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1334–35 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999). Such determinations are entitled to a "presumption of regularity." Id. at 1338. In fact, the FAR itself does not require a contracting officer to provide any explanation for her finding that an offeror meets the responsibility criteria. See FAR 9.105-2(a)(1) (stating that "the CO's signing of a contract constitutes a determination that the prospective contractor is responsible with respect to that contract").

To be sure, the FAR states that "before making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104." FAR 9.105-1. But for the most part, the contracting officer, is "the arbiter of what, and how much, information he needs," and is under no obligation "to seek additional or clarifying responsibility information from a contractor." Grimberg, 185 F.3d at 1303. Challenges to responsibility determinations therefore must overcome a "high hurdle" to succeed. Servisair 2 SCARL, 161 Fed. Cl. at 670.

### C. ESG's Challenges

#### 1. Financial Stability

ESG contends that the CO failed to conduct an adequate inquiry into Austal's financial stability. It argues that—in light of Austal's low proposed price and its ambitious proposed production schedule—it was not sufficient for the CO to base her responsibility determination largely on Austal's audited financial statements and D&B report. Specifically, ESG asserts, based on its cost projections Austal was likely to suffer "massive losses" that would "create a huge liquidity problem" and be "catastrophic for OPC program performance." Pl.'s MJAR at 47. Therefore, it contends, the CO should have prepared cash flow projections and a related risk assessment to determine whether Austal could perform at its proposed price.

This contention lacks merit. In essence, ESG is urging that the CO should have performed a price realism analysis before making her responsibility determination. See AGMA Sec. Serv., Inc. v. United States, 158 Fed. Cl. 611, 626 (2022) (a price that is unrealistically low may "reflect[] a lack of understanding of the solicitation's requirements, thus increasing the risk of poor performance."). But the RFP specifically stated that "[t]he Government will not perform cost or price realism analysis on any aspect of an Offeror's Price Proposal." See AR Tab 8 at 3939. And performing such an analysis is not a pre-requisite to finding an offeror financially responsible.

There is also no merit to ESG's argument that Austal violated the requirements of the RFP when it failed to provide the CO with its most recent financial statement (which covered FY2021). See Pl.'s MJAR at 48. The RFP required offerors to submit their three most recent annual financial statements, as well as their most recent quarterly assessment. See AR Tab 8 at 39267. Austal had already submitted its most recent financial statements before it submitted its FPR. See AR Tab 9d-10. The government did not require updated financial statements when it solicited FPRs; to the contrary, it informed offerors that "[i]f an FPR is not received by the due date, your current offer will be evaluated as the FPR." See AR Tab 65b-2 at 46571. The government appears to have therefore considered Austal's prior submissions—which included its three most recent financial statements—to be part of its FPR, as permitted by the terms of the RFP.

#### 2. Integrity and Business Ethics

ESG also questions whether the CO conducted a reasonable inquiry into Austal's integrity and business ethics. She found that "Austal USA had a satisfactory record of integrity and business ethics as verified by the FAPIIS and information obtained from Sam.gov." 65d3-46664. ESG contends that the CO should have, but did not, follow up to seek further information related to disclosures in Austal's financial statements which revealed: 1) that it was under investigation by Naval agencies; 2) that the DoD IG had sought financial and operational information from it by subpoena and search warrant; and 3) that Austal's parent company was the subject of an investigation conducted by Australian authorities in relation to a public contract. It also contends that the CO should have but did not undertake additional inquiries in light of news reports that it asserts "raised red flags regarding Austal responsibility issues." See Pl.'s MJAR at 48.

28

The CO was aware of the pending investigations reported in the financial statements. AR Tab 65d3 at 46665. She had no information, however, either from FAPIIS, Sam.gov, CPARS, or the Navy itself suggesting that the investigations had generated negative findings or information about Austal. Id. at 46666. While ESG would have preferred that the CO take a more aggressive approach, she acted within her discretion by instead relying on existing sources of information, including CPARS and FAPIIS, both of which the FAR specifically recognizes as repositories of relevant information for purposes of making responsibility determinations. FAR 9.105-1(c) (a CO "shall consider information available through FAPIIS . . . with regard to the offeror and any immediate owner, predecessor, or subsidiary identified for that offeror in FAPIIS, including information that is linked to FAPIIS such as from SAM, and CPARS, as well as any other relevant past performance information on the offeror").

For similar reasons, the Court is unpersuaded by ESG's argument that the CO was under an obligation to do a Google search as part of her assessment of Austal's integrity and business ethics and then follow up on any "red flags" that appeared. There is no requirement that a CO scour the internet for news stories to search for any indication of integrity or ethics issues. Instead, as noted, the FAR requires the CO to perform a search of government databases, which the CO in this case did.

### 3. False Certification

Finally, ESG argues that Austal made a false statement when it certified, as required by FAR 52.209-5(a)(1)(C), that none of its principals had been civilly charged by a governmental entity for "fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) contract or subcontract." See Pl.'s MJAR at 49. According to ESG, this certification was not made in good faith because in 2021, the Australian Securities and Investment Commission ("ASIC") in fact civilly charged Austal Ltd., Austal USA's parent company, and its former CEO, David Singleton, with securities fraud for providing misleading information about its U.S. shipbuilding business. See id.; see also ASIC Concise Statement at 1, Australian Sec. and Inv. Comm'n v. Austal Ltd. (2022) FCA 1231 ("ASIC Concise Statement"), available at https://download.asic.gov.au/media/vzjd3tj1/21-128mr-asic-v-austal-and-singleton-concisestatement-sealed.pdf. It further asserts that the defendants agreed to pay $1.2 million and to stipulate to a declaration that Austal Ltd had violated continuous disclosure obligations imposed by Australian law. See Pl.'s MJAR at 49. ESG argues that Austal violated FAR 9.104-6 by not disclosing the civil charges in its FAPIIS reports. See id. at 49–50.

The Court agrees with Austal that ESG's assertion—that Austal's parent company and its CEO were charged with securities fraud or another offense covered by FAR 52.209-5(a)(1)(C) (such as making false statements)—is inaccurate. On October 10, 2022, the Australian federal court issued a judgment adopting the settlement between Austal Ltd., its former CEO, and ASIC. See Australian Sec. and Inv. Comm'n v. Austal Ltd. (2022) FCA 1231 ("ASIC Judgment"), available at https://download.asic.gov.au/media/snyftjkv/22-282mr-asic-v-austal-judgment.pdf. The judgment stated that the defendants had contravened Section 674(2) of the Australian Corporations Act 2001 (entitled "Continuous disclosure") by failing to immediately notify the Australian Security Exchange about material information concerning the value of Austal Ltd.'s securities. The information at issue was that—contrary to defendants' prior earnings guidance, stating that Austal's US shipbuilding business would be profitable in FY 2016—Austal had become aware that the business would, instead, "likely generate a significant loss." ASIC

Concise Statement at 1. The Judgment provides that the defendants became aware of the information as of June 16, 2016, but waited until July 4, 2016, to make it public.[6] ASIC Judgment ¶ 51.

The original charges also included an allegation that Austal Ltd. "engaged in conduct in relation to a financial product or a financial service that was misleading or deceptive in contravention of Section 1041H(1) of the Act [Australian Corporations Act 2001]," ASIC Notice of Filing and Hearing, Australian Sec. and Inv. Comm'n v. Austal Ltd. (2022) FCA 1231, available at https://download.asic.gov.au/media/d2oc5t0w/21-128mr-asic-v-austal-and-singleton-originating-process-sealed.pdf.[7] The charges under section 1041(H)(1), which were dropped in the final judgment, are based on the same failures to promptly disclose that underlie the charges under Section 674(2). See id.

The more expansive language ASIC used in charging Austal was not accepted by the Australian court and did not constitute a fraud charge or a charge involving any of the other offenses set forth in the FAR, including the offense of making false statements. In fact, the Australian court's judgment expressly states that "it is no part of ASIC's case that Austal intentionally, willfully, fraudulently or dishonestly contravened, or was reckless in complying with, any legal obligation under statute or under the general law." ASIC Judgment ¶¶ 54, 56. Therefore, ESG's contention that Austal made a material misrepresentation when it certified that it had been neither charged nor convicted of one of the offenses set forth in FAR 52.209-5(a)(1)(C), lacks merit.

## VIII.   Organizational Conflict of Interest

In accordance with the FAR, contracting officers have a duty to "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible" and to "[a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a). As relevant here, a potential conflict is "significant" where it provides an offeror with "a substantial and unfair competitive advantage during the procurement process" based on information or data that is "not necessarily available to other [offerors]." PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010).

In its GAO protest, ESG alleged that Austal's employment of Commander Philip Crigler, the former Deputy Chief of the Coast Guard's Office of Cutter Forces during OPC 1, and his participation in the preparation of Austal's proposal for OPC 2, gave rise to an organizational conflict of interest ("OCI"). See AR Tab 43 at 42261–68. Specifically, ESG contended that when

---

[6] Certain principals at Austal learned of the need for a writeback of at least $90 million on June 16, 2016. See ASIC Judgment ¶ 39. After internal discussions, Austal held a board meeting on June 29 and decided to halt trading on its shares on June 30. See id. ¶¶ 45–46. Austal then announced its planned writeback of $115 million on July 4 and subsequently resumed trading. See id. ¶ 50.

[7] Section 1041(H)(1) states that a person "must not, in this jurisdiction, engage in conduct, in relation to a financial product or a financial service, that is misleading or deceptive or is likely to mislead or deceive."

Cmdr. Crigler served as Deputy Chief, he had access to ESG proprietary information that would have been competitively useful to Austal in crafting its OPC 2 proposal. Id.[8]

Although ESG ultimately withdrew its GAO protest, the CO investigated ESG's conflict of interest allegations and found them unsubstantiated. AR Tab 76 at 47497–98 (CO's OCI comparative harm memorandum). He found that neither Cmdr. Crigler nor anyone else in the Office of Cutter Forces had access to source selection information as part of their duties. Id. at 47497. In addition, he reasoned that while Cmdr. Crigler may have had some incidental exposure to ESG's non-public proprietary information during his service as Deputy Chief, it was "unlikely" that he retained the information "in a way that would be useful over three years later" when the OPC 2 RFP was issued. Id. at 47497–98. The CO also concluded that—even if Cmdr. Crigler had retained such information—it would no longer have been competitively useful to Austal because extensive information released by the Government for OPC industry studies contracts and OPC 2 "dwarfed" and "encompassed" it. Id. at 47498.

ESG argues that the CO's investigation concerning whether Cmdr. Crigler was exposed to ESG non-public and competitively useful proprietary information in his capacity as Deputy Chief for Cutter Operations was unduly narrow. Pl.'s MJAR at 57–60. It also argues that the CO ignored relevant evidence before him which it says demonstrated that Cmdr. Crigler enjoyed access to a variety of non-public proprietary information during his tenure. Id. at 60–67. Further, ESG contends that—contrary to the CO's conclusions—the information to which Cmdr. Crigler was exposed remained competitively useful when Austal prepared and then submitted its proposal several years after Cmdr. Crigler retired from the Coast Guard. Id. at 67–68.

The standard for judicial review of a CO's OCI determination is a "highly deferential" one. Oracle Am., Inc. v. United States, 975 F.3d 1279, 1296 (Fed. Cir. 2020); see also PAI Corp., 614 F.3d at 1351 (observing that "procurement decisions are subject to a 'highly deferential rational basis review'"). The FAR provides that contracting officers should use "common sense, good judgment, and sound discretion" when determining whether a "significant potential conflict exists[.]" FAR § 9.505(a). A court cannot set aside the CO's decision unless it is arbitrary, capricious, an abuse of discretion, or contrary to law. PAI Corp., 614 F.3d at 1352 (citing John C. Grimberg Co., 185 F.3d at 1300). Moreover, to succeed in a challenge to the CO's determination regarding a conflict of interest, "a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." Id. (quoting C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

In this case, as described in greater detail below, the CO's investigation of ESG's OCI claim was reasonable in scope and his findings had a rational basis in the record that he and his investigative team assembled. The Court therefore finds that the government and Austal are entitled to judgment on the administrative record as to ESG's conflict of interest claim.

---

[8] The CO did not know of the OCI allegations at the time of the award. AR Tab 76 at 47486. ESG's first notice of a potential OCI was communicated through its debriefing questions. Id.

A.      **Background**

1.      **The CO's Investigation**

As described in the declaration Cmdr. Crigler provided the CO in connection with his investigation, Cmdr. Crigler was stationed at Coast Guard headquarters from July 2015 until February 18, 2019, when he separated from the service. AR Tab 76a at 47499. Starting in April 2016 and until December 2018 he served as Deputy Chief of the Office of Cutter Forces, also known as "CG-751." Id. at 47500. During part of this time (from May to August 2018) he also served as Acting Director of CG-751. Id. From December 2018 until February 18, 2019 (his final day of service), Cmdr. Crigler had no specific duties. Id. Thereafter, and until April 30, 2019, he was on permissive and then terminal leave. Id. His retirement ceremony was held on March 22, 2019. AR Tab 76 at 47485.

Cmdr. Crigler began his employment with Austal in April 2019. Id. The RFP for OPC 2 was released on January 29, 2021, almost two years after Cmdr. Crigler's final day of service in February 2019. Id. at 47485. Cmdr. Crigler participated in the preparation of Austal's proposal for OPC 2, which Austal submitted on June 11, 2021. See id. at 47485–86. On March 18, 2022, more than three years after Cmdr. Crigler's final day of service, Austal submitted its final proposal revisions. Id. at 74785.

In his declaration, Cmdr. Crigler explained that he worked on Austal's proposals in his capacity as "capture manager." AR Tab 76a at 47499. His responsibilities involved overseeing the staff that prepared the proposals by assigning duties, identifying completion dates, and formulating overall themes. Id. He did not draft Austal's proposal himself, but he did provide comments on drafts of some of its sections that others prepared. Id. He was also responsible for submitting Austal's FPR and was part of Austal's debriefing team. AR Tab 76 at 47486.

The CO focused his investigation of ESG's OCI allegations on: (1) the extent to which Cmdr. Crigler had access to ESG's non-public proprietary information during his tenure as Deputy Chief of the Office of Cutter Forces; (2) whether any of the non-public proprietary information to which he was exposed would have remained competitively useful to Austal some two years later, when it was preparing its proposal; and (3) whether his access to such information resulted in an OCI. Id. at 47486–88. The CO's operating assumption was that if Cmdr. Crigler did have access to competitively useful ESG proprietary information, it was "likely that th[e] information was disclosed to Austal." Id. at 47486.

The CO conducted what he characterized as an "exhaustive" search to determine the nature of the information Cmdr. Crigler could and did access while serving as Deputy Chief. Id. He reviewed Cmdr. Crigler's declaration and his Officer Evaluation Report, and his team examined some 5,680 emails that Cmdr. Crigler either sent or received "to determine what, if any, acquisition documents or source selection documents may have been provided to Cmdr. Crigler. Id. 47486–87.[9]

---

[9] The Coast Guard routinely purges email accounts once an employee has been gone for more than one year, but the CO employed a contractor, CG-Cyber, to search active accounts for Outlook items (emails and calendar invites) for any instances where Cmdr. Crigler was on the "to," "from," or "cc" lines. See AR Tab 76 at 47492.

The CO also conducted interviews with a former Chief of CG-751 to whom Cmdr. Crigler reported, and a former Division Chief who reported directly to Cmdr. Crigler. Id. at 47487. The purpose of these interviews was to determine what information Cmdr. Crigler "would have had access to as part of his duties." Id.

The CO further sought to ascertain whether Cmdr. Crigler had access to the secured database where ESG's Contract Deliverable Requirements Lists ("CDRLs") were stored. See id.; see also AR Tab 43 at 42262–66 (ESG list of CDRLs it alleged Cmdr. Crigler had access to). He and his team also reviewed documents related to meetings and presentations Cmdr. Crigler attended. AR Tab 76 at 47487. These included meeting minutes, briefing materials, and travel records. Id.

Finally, the CO conferred with the TET, the OPC Program Management Office ("PMO"), and the Coast Guard's Ship Design Team to determine if the CDRLs listed in ESG's protest or any of the non-public information to which Cmdr. Crigler had access remained competitively useful considering the passage of time and intervening events. These included statutory relief provided to ESG under P.L. 85-804 in the wake of Hurricane Michael and the Coast Guard's release of "enormous" amounts of technical information prior to its issuance of the OPC 2 RFP. Id. at 47487–88; see also id. at 47494–97 (discussing impact of financial relief and release of technical data). In addition, he tasked the TET with determining whether Austal's proposal contained indications that it had access to ESG proprietary information that Cmdr. Crigler could have provided. AR Tab 78-2 at 48399.

## 2.    The CO's Findings

As described in his declaration, both as Deputy Chief and as Acting Director, Cmdr. Crigler was responsible for developing policy guidance for the Cutter Fleet and was the "fleet sponsor representative for defining capabilities, cutter recapitalization, and fleet sustainment." AR Tab 76a at 47500. The CO found that Cmdr. Crigler's role as Deputy Chief "was focused on identifying capability gaps and ensuring requirements can fill the gap." AR Tab 76 at 47497. The Office of Cutter Forces, CG-751, was not part of the acquisition directorate, CG-9, nor in its chain of command. See id. at 47489; see also AR Tab 76b at 47516–17 (stating that the Program Manager, CG-9322, is responsible for the acquisition program and describing his authorities).

The CO concluded that Cmdr. Crigler had no acquisition-related responsibilities. AR Tab 76 at 47497. He based this finding on, among other things, the interviews that he and his team conducted with individuals who served both above and below Cmdr. Crigler within his chain of command. See id. Those interviews revealed that each of the several Division Chiefs who reported to Cmdr. Crigler "focused on mission requirements and capabilities developments for different ships." Id. at 47489.  The interviewees confirmed that Cmdr. Crigler would not have had access to acquisition materials as part of his duties as Deputy Chief of Cutter Forces because his job focused on mission capabilities and requirements and because he did not oversee ship acquisition and construction. See id. at 47489–91.

The CO also investigated ESG's allegation that Cmdr. Crigler had access to more than 100 OPC 1 CDRLs that contained non-public proprietary, competitively useful ESG information. See id. at 47491, 47497; see also AR Tab 43 at 42262–66 (list of CDRLs ESG alleged Cmdr. Crigler had access). Based on a document-by-document review, the CO and his team concluded that twenty-seven of the 103 CDRLs that ESG identified might contain non-public proprietary

information. AR Tab 76 at 47497.  However, Cmdr. Crigler did not have access to those CDRLs because all of ESG's OPC 1 CDRLs were stored on the Naval Systems Engineering Resource Center ("NSERC"). Id. at 47491. To access that system, a user account was required. Id. Cmdr. Crigler did not have such an account. See id.

The CO also searched for mentions of ESG in emails and calendar invites to and from Cmdr. Crigler in all then-active email accounts. Id. at 47492. The CO identified one instance where a non-technical CDRL was provided to Cmdr. Crigler by email. Id. That CDRL consisted of a draft agenda related to a 2018 Final Critical Design Review meeting. Id. According to the CO, the draft agenda did not contain ESG proprietary information. Id.

The CO reviewed other emails that included references to ESG and determined that they did not contain any information that would provide Austal with a competitive advantage. Id. In fact, the emails that were retrieved had been sent to over fifty Coast Guard officials, with Cmdr. Crigler receiving a copy because of his role as the sponsor's representative. Id.

The CO noted that Cmdr. Crigler attended Critical Design Review and Production Readiness Review meetings held at a hotel in Panama City, Florida, during the summer of 2018. Id. at 47493–95. Based on his interview of a member of the Coast Guard Ship Design Team who also attended the meetings, he found that access to the rooms where the meetings were held was not controlled, that over 100 people were present at the meetings, and that the attendees included individuals who were not with ESG or the Coast Guard, such as representatives from the ship building industry as well as interested vendors, and some employees of the U.S. Navy. Id.

In addition, the CO commented that events that occurred after Cmdr. Crigler left the Coast Guard would have significantly diminished the value of any ESG proprietary information to which Cmdr. Crigler might have been incidentally exposed. Id. He observed that Cmdr. Crigler began his terminal leave in February 2019 and then retired several months later, before the Coast Guard decided to seek authorization under P.L. 85-804 to grant extraordinary relief to ESG or to re-compete the OPC contract. Id. at 47497. Therefore, he reasoned—at the time Cmdr. Crigler left the Coast Guard and joined Austal—he did not have access to non-public source selection information or even a reason to anticipate that Austal would be building OPCs in the future. Id.

Moreover, the CO explained, the Coast Guard, "in an attempt to maximize competition, [had] awarded industry studies contracts, utilized a draft RFP process, and provided design information as part of the Stage 2 RFP." Id. at 47496. Specifically, "[t]he OPC technical library . . . provided updated design information that reflected the current state of OPC acquisition activities and design progress to potential offerors." Id. The CO noted that "large numbers of CDRL documents from the OPC Stage 1 contract were provided to shipyards as part of the standardization of the majority of the design for the Stage 2 competition." Id.

The OPC 2 RFP, the CO explained, "was informed by extensive industry engagement, including contracted industry studies with eight . . . U.S. shipyards, an invitation to review and respond to a draft RFP, and the establishment of an OPC technical library." AR Tab 76 at 47484. The CO reasoned that "[a]ny high level information presented in these hotel conference rooms, at widely attended gatherings without facility security clearances, if still relevant four years later, would have been dwarfed by and encompassed by the extensive information released by the government as part of its OPC 2 solicitation." Id. at 47498; see also id. at 47494–95 (CO's

finding that "any ESG proprietary or non-public information" potentially disclosed during these meetings "would have been provided before Hurricane Michael and further rendered worthless when the extensive OPC Technical library[,] . . . containing enormous amounts of information about the OPC Design," was posted).

Based on the foregoing findings, the CO concluded that Cmdr. Crigler "did not have access to any source selection information, did not have access to non-public proprietary information which represented an unfair competitive advantage, and overall represented no organizational conflict of interest." Id. at 47498.

## B.     Austal's Contention that ESG Waived its OCI Claims

Before turning to the merits of ESG's challenges to the CO's investigation and OCI determination, the Court must address a preliminary issue raised by Austal: whether ESG waived its right to challenge the CO's OCI determination under the reasoning of Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed Cir. 2007). See Def.-Intervenor's Cross-MJAR at 54–56; see also Def.'s Reply in Supp. of Cross-MJAR at 22 n.1, ECF No. 64 (expressing agreement with Austal's waiver argument). Austal contends that ESG knew or should have known well before the RFP was even issued that Austal had hired Cmdr. Crigler and that he would be working on the OPC 2 procurement. Def.-Intervenor's Cross-MJAR at 55–56. Nonetheless, it points out, ESG did not raise the OCI issue until after the Coast Guard awarded the contract to Austal. Id. at 56.

Austal's argument lacks merit. In Blue & Gold, the court of appeals held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313 (emphasis added); see also Raytheon Co. v. United States, 809 F.3d 590, 597 (Fed. Cir. 2015) (observing that Blue & Gold established "a general rule that a losing bidder waives a post-award challenge to the terms of a solicitation if it does not object to the terms before the bidding process closes" (emphasis added)). ESG's OCI protest, however, is not based on flaws in the terms of the OPC 2 solicitation.

Austal's reliance on Inserso Corp. v. United States, 961 F.3d 1343 (Fed. Cir. 2020), is misplaced. In that case, the protester alleged that the OCI at issue occurred as a result of the terms and structure of the solicitation. See id. at 1346–47. Therefore, under Blue & Gold, the protester was required to file its protest pre-award. See id. at 1352 ("Because a bidder . . . exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before the awards were made, Inserso forfeited its right to raise its challenge by waiting until awards were made." (emphasis added)); see also id. at 1350 (holding that "Inserso should have challenged the solicitation before the competition concluded" (emphasis added)).

In short, Blue & Gold is inapposite. The Court therefore rejects Austal's waiver argument and turns its attention to the merits of ESG's claim.

## C.     ESG's Arguments

As noted above, ESG mounts several challenges to the CO's conflict of interest determination. It contends first that the CO's investigation was too limited in scope. See Pl.'s

35

MJAR at 50–56. It further argues that the CO did not give sufficient weight to certain evidence that, according to ESG, indicates that Cmdr. Crigler had access to ESG's non-public proprietary information when he was Deputy Chief of the Office of Cutter Forces. See id. at 57–60. Moreover, ESG argues, the CO's determination that any ESG proprietary information to which Cmdr. Crigler might have been exposed would not have been competitively useful to Austal in the OPC 2 procurement was unreasonable. See id. at 60–68.

The Court concludes that ESG has failed to demonstrate that the CO's investigation or the conclusions he reached were arbitrary, capricious, or otherwise contrary to law. First, the CO CO's findings that Cmdr. Crigler had no procurement-related responsibilities when he served as Deputy Chief of Cutter Forces are consistent with Cmdr. Crigler's declaration, the Coast Guard documents gathered during the investigation, and the interviews the CO and his team conducted. Compare AR Tab 76 (CO's OCI comparative harm memorandum) with AR Tab 76a (Cmdr. Crigler's declaration); AR Tabs 76b–76m, 78 Exs. 1–4 (documents gathered during the investigation); Tab 77a (CO's interview notes).

There is similarly ample support in the record for the CO's finding that Cmdr. Crigler did not have access to ESG proprietary information that would have afforded Austal an unfair competitive advantage in the OPC 2 procurement. First, as the CO found, Cmdr. Crigler was not authorized to access NSERC, the system into which the CDRLs for OPC 1 had been uploaded. As the CO explained, "access to NSERC is strictly controlled." AR Tab 76 at 47491. "All NSERC users have a terms of use agreement on file" and "[a] person cannot gain access to the OPC CDRL Center without having a signed agreement, and being granted access." Id. Moreover, the CO observed, "[m]ultiple searches from the USCG as well as the Navy confirm[ed] that Cmdr. Crigler never had access to NSERC and therefore was not able to access or retrieve OPC program information directly through NSERC." Id.

The CO's conclusion that Cmdr. Crigler did not have access to ESG's CDRLs or other competition-sensitive information is also supported by his team's interview of Witness 1, a former Division Chief who worked under Cmdr. Crigler. During her interview, Witness 1 stated that "neither Cmdr. Crigler nor any of the Division Chiefs [who reported to him] would have had access to the types of documents listed in ESG's [GAO] protest because their job focused on mission capabilities and requirements." AR Tab 76 at 47490.

Witness 1 further told investigators that—given the scope of Cmdr. Crigler's responsibilities—she would not have expected him to focus on the details of the OPCs or ESG's CDRLs. She advised that:

> There is a lot going on in Cutter Forces in these divisions and yet he [i.e., Cmdr. Crigler] was the upper person, so to be focusing on one ship with this level of detail, he was not in my business for anything, and knowing the guy, he was just not that detail oriented, he was very high level, big picture strategy. That stuff about the CDRLs and the NAVY system (NSERC), I think you should look, he would have never requested access to a system like that unless someone automatically gave him access.

AR Tab 77a at 48362 (notes of interview with Witness 1); see also id. (observing that "[t]he way the deputy works, I was in charge of medium endurance cutter, OPC, 270 SLEP, 210, EAGLE"; that Cmdr. Crigler "just didn't delve into the detail of any single cutter"; and that "besides me, he

had at least four other divisions, HECs, PSC, Patrol boats"). Wtness 1 also explained that the primary documents that CG-751 handled with respect to OPCs were Mission Need Statements, Concept of Operations Documents, and Operational Requirements Documents, which she characterized as "precontract documents defining capability gaps," not "acquisition documents." Id. at 48363; see also AR Tab 76 at 47490 (describing the documents CG-751 handled).

The CO's team also interviewed Cmdr. Crigler's former supervisor, Witness 2, who served as Chief of CG-751 from June 2017 to July 2018. AR Tab 76 at 47490–91.  Witness 2 acknowledged that he could not "guarantee" that Cmdr. Crigler "never" saw any acquisition-related information. AR 77a at 48364. But he told the investigators that CG-9 was generally responsible for all acquisition paperwork and discussions. Id. CG-751, he said, "stayed in our lane as the sponsor's representative through the requirement process." Id. In fact, he noted that the "[f]unny thing [was that] as office chief, when acquisition stuff happens, I find out in the papers like everyone else." Id. In short, consistent Witness 1's views, Witness 2 stated that "to the best of [his] knowledge" neither Cmdr. Crigler nor he had ever had access to the kind of information ESG described in its GAO protest. Id. at 48365.

ESG contends that the CO should have interviewed more of Cmdr. Crigler's subordinates and questioned them about whether—notwithstanding security protocols—they supplied Cmdr. Crigler with documents that were uploaded into NSERC. Pl.'s MJAR 57–60. For example, ESG contends, the CO should have but did not follow up to ask more questions about Cmdr. Crigler's response to a June 12, 2017 email from Cmdr. Theodore Erdman. Pl.'s MJAR at 57 (citing AR Tab 79 at 102843). The email contained an NSERC link to information concerning ESG's 3D OPC model and upcoming Initial Critical Design Review. Id. Cmdr. Crigler responded to Cmdr. Erdman (with a copy to Zachary Dietz, one of Cmdr. Crigler's subordinates) that "I cannot access the read-a-heads, please advise." AR Tab 79 at 102843. Apparently, neither Cmdr. Erdman nor Lt. Dietz responded via email to Cmdr. Crigler because the email search uncovered no such response. See AR Tab 76 at 47492 (stating the CO and his team "reviewed all the emails provided" by CG-Cyber). According to ESG, the CO should have followed up to find out whether, in response, Cmdr. Erdman and Lt. Dietz provided Cmdr. Crigler with hard copies of these documents themselves. Pl.'s MJAR at 57.

To be sure, the CO could have questioned Cmdr. Erdman and Lt. Dietz about whether—notwithstanding that only individuals with NSERC credentials were permitted to access these documents—they provided hard copies to Cmdr. Crigler to circumvent information security protocols. But ESG provides no hard facts showing that Cmdr. Crigler's subordinates attempted to circumvent access restrictions by giving Cmdr. Crigler copies of documents uploaded into NSERC that contained competition-sensitive proprietary information.[10] And it was hardly

---

[10] The one CDRL that was provided to Cmdr. Crigler via email was non-technical in nature and did not contain any of ESG's proprietary information. See AR Tab 76 at 47492–93. And ESG's contention that Cmdr. Crigler was "emailed ESG competitively useful, nonpublic information on ESG proposed design changes" is also unpersuasive. Pl.'s MJAR at 58 (citing AR Tab 79 at 110271–72). As the Coast Guard explains, there is no evidence that Cmdr. Crigler received the white paper discussed in the email chain forwarded to him. AR Tab 67 at 46849 (USCG Suppl. Doc. Produc. Ltr. to GAO (Sep. 13, 2022)); see also AR Tab 79 at 110272 (Email from Keister,

irrational for the CO to base his determinations regarding Cmdr. Crigler's information access on the 5,680 emails recovered from active accounts, as well as tens of thousands of pages of documents and meeting records, and the interviews of Witness 1 and Witness 2.

The CO's investigation also encompassed the review of other documents that were deemed to potentially contain ESG proprietary data. For example, searches of electronic records were conducted as to Integrated Product Team ("IPT") Charters, Task Commitment Memos, and travel records that might connect Cmdr. Crigler to ESG. See AR Tab 76 at 47493. The CO noted that the team identified one unsigned, undated IPT charter that listed Cmdr. Crigler as a member, but that the charter had "no direct relationship to ESG or OPC" and was instead "related to the CONOPS for all USCG Boats and Cutters." Id.

ESG contends that the CO should not have confined the search to IPT Charters that listed Cmdr. Crigler by name. See Pl.'s MJAR at 58–60. It notes that "the AR reflects that nearly every charter listed 'an unnamed CG-751 rep.'" and theorizes that it was "likely" that this unnamed representative "reported to the Deputy, worked alongside the Deputy, or was the Deputy." Id. (citing AR Tab 77b at 48376). But ESG supplies no hard facts to support its theory that CG-751 staff members who reported to Cmdr. Crigler passed competition-sensitive ESG proprietary information from IPT charters on to him.

Similarly, ESG faults the CO for not conducting additional searches to determine whether Cmdr. Crigler had access to competition-sensitive ESG proprietary information through the OPC Risk and Opportunity Management Board ("ROMB") on which he sat "from at least 2016 through at least February 2019." Id. at 60. At these meetings, according to ESG, Cmdr. Crigler was provided with information about "ESG OPC risks, weaknesses, and mitigation," which ESG claims would have been useful to Austal in the OPC 2 competition. Id. at 61.

But the CO's searches did recover at least some ROMB documents. For example, a set of ROMB minutes from December 2018 surfaced as an attachment to one of the thousands of emails the CO and his team examined. See AR Tab 76 at 47493; see also AR Tab 76j (email from Gabriel, M.T., to ROMB members (Dec. 21, 2018)). The CO concluded, however, that the "risks" discussed in those minutes were "characteristic of the type of cross-platform level risks that the program sponsor would be responsible for tracking." AR Tab 76 at 47493.

ESG also argues that CG-751's weekly reports "analyzed the impacts of Hurricane Michael on ESG and the OPC program, discussed ESG design, and other competitively useful, non-public information." Pl.'s MJAR at 62. In fact, it notes, the CG-751 Weekly Reports that Cmdr. Crigler was provided are labelled "Contains Sensitive Information – For Official Use Only." Id.  Similarly, it observes, each page of the "EOA Propulsion/Auxiliary Systems Brief" that was provided to Cmdr. Crigler was marked "This brief contains Acquisition Sensitive material and should not be disclosed or released except as stipulated in Federal Acquisition Regulation (FAR) Sub-part 3.104-4." Id. at 63–64.

---

S.A., to Witness 2, and Crigler, P.A. (Jun. 28, 2017)).

Of course, the "for official use only" legend does not denote that a document contains non-public proprietary information, much less information that would have been useful to Austal in formulating its proposal. And, as the CO found, proprietary information that was "acquisition sensitive" in 2017 would not necessarily have given Austal a competitive advantage in the OPC 2 procurement given the intervening events described below.

Similarly, ESG's arguments that Cmdr. Crigler's attendance at Deputies Council and Tri-P meetings required his exposure to ESG's proprietary information are not based on hard facts. See id. at 65–66. According to the Coast Guard, "the Tri-P is a safety and environmental review board . . . and does not make decisions relative to procurements or source selections." AR Tab 67 at 46847. It further states that the Deputies Council "is an executive level . . . advisory board that . . . 'ensures collaboration on Headquarters and enterprise-wide management issues.'" AR Tab 59 at 46388. Therefore, the Coast Guard told GAO, "ESG proprietary information . . . [is] unrelated to the scope of the Tri-P and the Deputies Council meetings, and would never be presented at that level." Id.

While the CO concluded that Cmdr. Crigler generally did not have cause to access or review competition-sensitive data, he acknowledged that his investigation revealed several occasions where Cmdr. Crigler might have incidentally been exposed to potentially competition-sensitive information. See AR Tab 76 at 47497. For example, Cmdr. Crigler attended final critical design review and production readiness review meetings that were held at the Holiday Inn in Panama City, Florida in 2018. See id. at 47497–98. The CO's team secured further information by interviewing Witness 3, a member of the Coast Guard's Ship Design Team who also attended the meetings. See id. at 47494–95. As a result of information Witness 3 provided, the CO concluded that any proprietary information presented at the meetings "would have been dwarfed by and encompassed by the extensive information released by the Government as part of both the OPC Industry Studies contracts as well as the OPC Stage 2 Draft RFP and OPC Stage 2 DD&P solicitation." Id. at 47498; see also id. at 47494–95 (CO's report stating that both meetings were attended by over 100 people, including individuals outside of the Coast Guard and ESG, and that the information would have been disclosed as part of the OPC 2 Technical Library). Moreover, the CO concluded that most of the information presented in those meetings was high-level and unlikely to have "sufficient details . . . to be beneficial to Austal." See id. at 47498. And, in any event, the CO reasoned, it was highly unlikely that Cmdr. Crigler could have retained information from these meetings "in a way that would be useful over three years later when the OPC Stage 2 . . . solicitation was released." Id. at 47497–98.

To be sure, the CO could have interviewed more witnesses and gathered more documents. And it is conceivable that this additional review would have revealed that Cmdr. Crigler had more access to competition-sensitive ESG proprietary information than the CO and his team found. But, as noted above, it is the CO's responsibility to analyze the circumstances that are said to give rise to a conflict of interest, using his own "common sense, good judgment, and sound discretion." FAR § 9.505(a). And, as the Federal Circuit has observed in the analogous context of responsibility determinations, "the contracting officer is the arbiter of what, and how much, information he needs" to determine whether an OCI exists. See John C. Grimberg Co., 185 F.3d at 1303.

The Court also finds it significant that the CO employed the OPC 2 TET to cross check the conclusions he and his investigative team reached regarding Cmdr. Crigler's access to

competition-sensitive information. He asked the TET to "take another look" at Austal's proposal for "any indication that the offeror had made use of proprietary or non-public information" that Cmdr. Crigler might have obtained while employed by the Coast Guard. AR Tab 78-2 at 48399. The TET found no indications that any such information had been used by Austal in formulating its offer and it documented its findings in detail. Id. at 48399–401.

In that regard, the Court is unpersuaded by ESG's references to the price revisions Austal made in its FPR, which it says shows that Austal "had a price-to-win number in mind" that was based on ESG proprietary information See Pl.'s MJAR at 66–67. This assertion is not supported by hard facts and is contrary to the TET's findings. As the CO explained, after Cmdr. Crigler retired from the Coast Guard and joined Austal, the Coast Guard provided Eastern with relief under P.L. 85-804. As part of that relief, the Coast Guard repriced OPC 1 CLINs, which "had the effect of dramatically changing the vast majority of pricing on the contract." AR Tab 76 at 47496. Thus, the CO reasoned, even if Cmdr. Crigler had been exposed to ESG "proprietary or non-public pricing information," and even if he retained that information long after he had left the Coast Guard, such information "would have been rendered moot by the P.L. 85-804 price adjustment." Id.

In sum, the CO thoroughly investigated ESG's OCI claim and reasonably found it without merit. The record supports his findings that Cmdr. Crigler did not serve in an acquisition-related role and had no reason to access ESG's competition-sensitive proprietary information to perform his duties. Moreover, the CO had a rational basis for finding that any information to which Cmdr. Crigler might have incidentally been exposed (and which he also retained) would not have provided Austal with a significant competitive advantage because: (1) a substantial amount of time had passed between Cmdr. Crigler's employment and the issuance of the OPC 2 RFP; (2) in the interim, Hurricane Michael substantially altered ESG's pricing and production plans; and (3) the Coast Guard released enormous amounts of technical data to OPC 2 offerors. ESG's motion for judgment on the administrative record as to its OCI claim must accordingly be denied.

## IX.    ESG's Motion to Complete or Supplement the Administrative Record

Shortly after the government filed the administrative record in this case, ESG filed a motion to complete or supplement the record to include: (1) communications between Witness 4 and the CO; (2) Tri-P documents; (3) Deputies Council documents; (4) attachments and documents referenced in an email from Lt. Brian Field to Cmdr. Crigler; and (5) NSERC documents that Cmdr. Crigler supposedly may have accessed. See Pl.'s Mot. to Suppl. Admin. R. at 22–31. Alternatively, ESG requested that the Court remand the case back to the agency with directions that the CO collect and review those documents and make a new determination concerning Cmdr. Crigler's access to competition-sensitive ESG proprietary information during his tenure as Deputy. See id. at 1, 3, 35–36.

To the extent that ESG's motion is treated as one to "complete" the administrative record, it lacks merit. A motion to complete the record is appropriate "where a party seeks to add documents that are relevant to the challenged agency decision and were considered by the agency in reaching its decision." BHB Ltd. P'ship v. United States, 147 Fed. Cl. 226, 229 (2020) (emphasis added) (citing Poplar Point RBBR, LLC v. United States, 145 Fed. Cl. 489, 494 (2019)). Here, ESG asks the Court to add documents to the administrative record that the CO deliberately decided not to consider.

ESG, in other words, is asking the Court to supplement, not correct the administrative record. But it is well established that the "focal point" of the Court's review of an agency's procurement decision "should be the administrative record already in existence, not some new record initially made in the reviewing court." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). That limitation is imposed to "guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" AgustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (quoting Axiom, 564 F.3d at 1380).

Accordingly, courts only allow supplementation of the administrative record in limited circumstances where "extra-record evidence" is necessary for "effective judicial review" of the agency's decision. Id. (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000)). For example, supplementation of the record may be appropriate where the record does not include an explanation for the agency action under review. See Impresa Construzioni, 238 F.3d at 1337–39) (permitting protester to depose contracting officer and supplement the record with his testimony when the record contained no explanation for the contracting officer's responsibility determination). Supplementation may also be appropriate where the record is missing "relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith . . . ." See, e.g., InfoReliance Corp. v. United States, 118 Fed. Cl. 744, 747 (2014) (quoting Orion Int'l Techs. v. United States, 60 Fed. Cl. 338, 343–44 (2004)).

Neither of those circumstances exist here and ESG has not otherwise persuaded the Court that meaningful review of the CO's determination requires that the Court consider the extra-record evidence ESG has identified. The Court's determination that the CO acted within his considerable discretion when he established and executed his investigative plan was based on the breadth and nature of the information the CO and his team did gather and did consider, as described in detail above. See discussion supra Section VIII. And having reached the conclusion that the CO's investigation was reasonable in scope, the only issue that remained for the Court to decide was whether—based on the information the CO actually gathered and considered (and not on additional information he might have gathered and considered)—his OCI determination had a rational basis.

For similar reasons, the Court declines to supplement the administrative record with the Declaration of Jason M. Vanderhaden, who served from June 2016 to May 2018 as the Command Master Chief to the Deputy Commandant for Mission Support at the Coast Guard. See Pl.'s Mot to Suppl. Admin. R. Ex. 1, ¶ 3, ECF No. 43-1. In his declaration, Mr. Vanderhaden describes, among other things, the composition of the "Cutter Tri-P" working group and the Deputies Council, the subject matter of their meetings, and the documents and materials made available to participants at the meetings. Id. ¶¶ 4–11. He also provides his impressions of Cmdr. Crigler's state of mind and command of the subject matter discussed at the meetings. See, e.g., id. ¶ 6 (opining that Cmdr. Crigler "seemed to have all the information" at Tri-P meetings); id. ¶ 16 (Cmdr. Crigler "seemed to be aware of every facet of the OPC program"). Further, Mr. Vanderhaden provides his opinions regarding what information Cmdr. Crigler would have needed to perform his duties and participate in the Tri-P meetings. See id. ¶ 20 (Cmdr. Crigler "likely" would have had access to OPC 1 documents on NSERC "as necessary" for his duties);" id. ¶ 9 (Cmdr. Crigler needed ESG cost, price, and schedule information to participate in Tri-P meetings). Indeed, according to Mr. Vanderhaden, Cmdr. Crigler could not have performed his work on the Tri-P "without access to competitively useful, nonpublic information. Id. ¶ 9.

41

Although not disclosed in his declaration, Mr. Vanderhaden is currently employed by ESG. Def.-Intervenor's Resp. to Pl.'s Mot. to Suppl. Admin. R. Attach. 1, at 2, ECF No. 54-1 (email from Pl.'s counsel to Def.-Intervenor's counsel confirming ESG employs Mr. Vanderhaden (Dec. 5, 2022)). He is not a disinterested observer and his failure to disclose his affiliation with ESG in his declaration undermines its credibility.

In any event, it is not entirely clear to the Court what purposes ESG intended Mr. Vanderhaven's declaration to serve. The declaration was not before the CO, so Mr. Vanderhaden's assertions cannot be considered in assessing the merits of ESG's contention that the CO's investigation was unduly circumscribed or that his ultimate determination lacked a rational basis. And to the extent that ESG is submitting the declaration to establish that the Court cannot effectively review the CO's decision without considering additional Tri-P or Deputies Council documents, the Court is unpersuaded for the reasons set forth above.

The Court has considered the other arguments presented in ESG's motion to supplement, many of which overlap with the arguments in its MJAR, and it finds them without merit. ESG has failed to show that consideration of the additional documents is necessary to effectively review whether the agency's OCI determination was arbitrary, capricious, or contrary to law.

The Court also rejects ESG's alternative request that this case be remanded with instructions that the CO review the additional categories of information set forth in its motion and make a new OCI determination. The CO acted within his discretion in deciding what information was necessary to assess ESG's OCI allegations and his determination had a rational basis in the record he assembled. Remand is therefore unwarranted.

## CONCLUSION

For the reasons set forth above, ESG's Motion for Judgment on the Administrative Record, ECF No. 46, is **DENIED**. The government's and Austal's Cross-Motions for Judgment on the Administrative Record, ECF Nos. 58–59, are **GRANTED**. Additionally, ESG's Motion to Supplement or Complete the Administrative Record or for Remand, ECF No. 43, is **DENIED**. The clerk is directed to enter judgment accordingly.

Pursuant to the Court's protective order, ECF No. 12, this Opinion has been issued under seal. The parties shall file their proposed redactions to the Opinion by November 20, 2023. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998); Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993)), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge